**In re CONSTON CORPORATION, INC. d/b/a 16 Plus d/b/a Charles Shop d/b/a Famous Maid d/b/a Kristy's Kids d/b/a Marcia Stuart (Bankr. Nos. 90–12571S through 90–12600S Jointly Administered with this case), Debtor.**

**Bankruptcy No. 90–12570S.**

United States Bankruptcy Court,
E.D. Pennsylvania.

Aug. 13, 1991.

L. Louis Mrachek, Gunster, Yoakley & Stewart, P.A., West Palm Beach, Fla., William I. Kramer, Wolf, Block, Schorr and Solis–Cohen, Philadelphia, Pa., for debtor.

Robert Levin, Adelman Lavine Gold & Levin, Philadelphia, Pa., for Creditors' Committee.

David L. Pollack, Rosenwald and Pollack, Philadelphia, Pa., for Echelon Mall, Inc. Store No. 012, The Equitable Life Assoc. Store No. 772, The Equitable Life Assoc. Store No. 789, The Equitable Life Assoc. Store No. 816, The Rouse Co. of Iowa Store No. 794.

Joel F. Crystal, New York City, for New Plan Realty Trust.

John Monnato, Indianapolis, Ind., for Lakehurst Joint Venture, Store No. 837.

Laura Woodall, Indianapolis, Ind., Paralegal for Tulsa Mall Co. L.P., Store No. 785 and Oakwood Mall L.P., Store No. 840.

Frederic Baker, Asst. U.S. Trustee, Philadelphia, Pa.

Thomas J. Leanse, Los Angeles, Cal., for Ernest W. Hahn, Inc., Store No. 090, Mall of Memphis Assoc., Store No. 110.

Christopher G. Kuhn, Silberman, Markovitz & Raslavich, Philadelphia, Pa., for Hudson Associates L.P., Store No. 354.

James L. Weisman, Pittsburg, Pa., for Morse Road Co., Store No. 770.

Robert E. L. Wright, Kalamazoo, Mich., for Maple Hill Mall Associates, Store No. 854.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

At issue is interpretation of 11 U.S.C. § 502(b)(6), which limits the measurement of the amount of damages to which a landlord is entitled upon the rejection of a lease by a debtor-tenant. We agree with the dissenting landlords on both of the two principal issues of interpretation of § 502(b)(6) in dispute in answering the following questions as indicated: (1) May the Debtors deduct post-petition rents paid to the landlords in calculating the amounts subject to the limitation of damages for "one year?" (NO); and (2) Are utility charges which certain leases categorize as "additional rent," considered as "rent received?" (YES). Therefore, except for those landlords who agreed to a more disadvantageous treatment until enlightened about the first issue by counsel, the claims of the dissenting landlords must be allowed in amounts generally consistent with their respective positions on these issues.

### B. UNDERLYING FACTS

These cases involve 31 related debtor-corporations, retailers of large-size women's apparel ("the Debtors"), which operated a cumulative number of over 350 retail stores prior to their bankruptcy filing on June 22, 1990. In August, 1990, the majority shareholders of the Debtors sold their stock to Cascade International, Inc. ("Cascade"). In addition to funding a Plan of Reorganization, confirmed on April 18, 1991, which will ultimately pay all creditors in full, Cascade embarked on a program to reduce the number of the Debtor's retail stores by about one-half.

All of the decisions as to which stores should be retained and the leases assumed, and which stores were to be closed and the leases rejected, were not easy to make. In the instances of about forty (40) of the stores, the Debtors paid post-petition rent for several months, but ultimately decided to reject the leases.

After confirmation, the Debtors commenced the tedious process of objecting to hundreds of proofs of claims, all of which would have had to have been paid in full if the Debtors did not successfully object thereto. See 11 U.S.C. § 502(a). Almost all of these objections have been resolved by negotiation between the Debtors and

the claimants. The matters in dispute are general issues which pervade many of the landlords' claims. The issues were argued on July 31, 1991, and several Briefs were submitted on that date. A Stipulation of Facts was submitted relative to the second issue only. No testimony was adduced.

Both issues presented require interpretation of 11 U.S.C. § 502(b)(6), which provides as follows:

(6) if such claim is the claim of a lessor for damages resulting from the termination of a lease of real property, such claim exceeds—

(A) the rent reserved by such lease, without acceleration, for the greater of one year, or 15 percent, not to exceed three years, of the remaining term of such lease, following the earlier of—

(i) the date of the filing of the petition; and

(ii) the date on which such lessor repossessed, or the lessee surrendered, the leased property; plus

(B) any unpaid rent due under such lease, without acceleration, on the earlier of such dates;

According to the Debtors' counsel, the first issue (may the Debtors deduct post-petition rent payments in the § 502(b)(6) calculation?) was raised by about half of the landlords of the forty (40) stores in issue. The other half agreed to claims which were calculated subject to deduction of the Debtors' post-petition payments. Resolution of this first issue is purely a matter of interpretation of § 502(b)(6).

The second issue was raised by only two landlords. Counsel for the Debtors and the landlords agreed that this was because the relevant lease provisions were unique to those leases. The leases, attached as exhibits to the parties' Stipulation of Facts, provide, at Article 8, that

[i]n addition to the minimum annual rental specified in Article I [which is entitled "Fundamental Lease Provisions" and re-

cites a "Minimum Annual Rental" figure], Tenant shall pay, monthly in advance, a utility charge to reimburse Landlord for utilities furnished by Landlord, if any, to the premises.

Earlier in the lease, at Article 5E, it is provided that

[t]he Tenant shall pay, as additional rent, all sums of money required to be paid pursuant to the terms of Article 5B and 5C [addressing "minimum annual rent" and "taxes and insurance expense," respectively], the sums to be paid pursuant to Articles 8, 19 [addressing common area charges], 20 [addressing "enclosed mall" charges], 29 [addressing "merchant association" fees] and Exhibit "C" of this Lease [relating to construction of tenants' stores], and all other sums of money or charges required to be paid by Tenant under this Lease, whether or not the same be designated "additional rent."

The parties stipulated that the fixed utility charges at the two locations in issue were $517 per month and $960 per month, respectively.[1]

A third issue is before us for decision, which we reach only due to our resolution in favor of the landlords on the first issue. On July 22, 1991, a paralegal employed by a management company for two of the landlords executed a letter agreement stipulating to allowance of these landlords' claims in specific sums which included deductions of the post-petition rents paid by the Debtors to these landlords in the calculations. This paralegal had apparently filed the most recent proofs of claims of these landlords and had actively negotiated the settlement of the claims with the Debtors' counsel, without consulting Philadelphia counsel who had represented these landlords previously in the course of this case. On July 30, 1991, that same Philadelphia counsel directed a letter to the Debtors' counsel which purported to revoke the letter agreement of July 22, 1991. No impropriety on behalf of the Debtors' counsel

---

1. Other monthly charges for these locations were minimum rent of $2,482.50, common area maintenance charge of $828 and taxes of $123 at one location; and minimum rent of $3,852.50, common area maintenance charge of

$2,471, taxes of $269, and air conditioning charge of $375 at the other. Therefore, the utility charges were about thirteen (13%) percent and twelve (12%) percent, respectively, of the monthly charges due under these leases.

in negotiating with the paralegal, as opposed to Philadelphia counsel, was alleged in the July 30, 1991, letter, or in the course of oral argument on July 31, 1991.

## C. DISCUSSION

1. *The Debtors are not Authorized to Deduct their Post–Petition Rental Payments in Calculating the Cap on the Landlords' Claims Under § 502(b)(6).*

■ The historical "differing treatment" of landlords' claims, in contrast to that of other allowable claims, is well chronicled by Collier. 3 COLLIER ON BANKRUPTCY, ¶ 502.02[7], at 502–54 to 502–64 (15th ed. 1990). In 1934, the predecessor to § 502(b)(6) was added to the Bankruptcy Act of 1898 to overcome a bar to landlords' collection of any post-petition rent claims because such claims could not be absolutely fixed and hence were not "provable." *Id.,* ¶ 502.2[7][a], at 502–56. However, as a trade-off, and because of a recognition that such claims could be very large, a landlord's claim was limited to

> the rent reserved by the lease, without acceleration, for the year next succeeding the date of the surrender of the premises to the landlord or the date of reentry of the landlord, whichever first occurs, whether before or after bankruptcy, plus an amount equal to the unpaid rent accrued, without acceleration, up to such date: ...

11 U.S.C. § 103(a)(9) (§ 63(a)(9) of the Bankruptcy Act of 1898, as amended) (repealed). *See* 3 COLLIER, *supra,* ¶ 502.02[7][a], at 502–57.

In the drafting of the Code, the inclusion of an amount "equal to the unpaid rent accrued," in addition to the rent payable over the next year or the future three years, was omitted. *Id.,* ¶ 502.02[7][b], [c], [d], at 502–58 to 502–62. There are statements in the legislative history that indicate a presumed continued vitality of the holding in *Oldden v. Tonto Realty Corp.,* 143 F.2d 916, 920–21 (2d Cir.1944), that any security deposit held by the landlord should be deducted from its claim in calculation of the § 502(b)(6) cap. S. REP. NO. 95–989,

95th Cong., 2d Sess. 63 (1978); and H. R. REP. NO. 95–595, 95th Cong., 1st Sess. 353 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5849, 6308. *See* 3 COLLIER, *supra,* ¶ 502.02[d], at 502–62 to 502–63. However, it is unclear whether any significance can be attributed to the omission of addition of "unpaid rent accrued" to the applicable Code section.

The issue of whether the Debtors are entitled to deduct post-petition rental payments from landlords' claims in making the § 502(b)(6) computation is not directly addressed in the legislative history or by Collier. The parties agreed that the issue is highlighted in but three reported cases. In one, *In re McLean Enterprises, Inc.,* 105 B.R. 928, 937 (Bankr.W.D.Mo.1989), the court does not deduct the post-petition payments in its calculations without discussing the issue. In another, the court, also without discussion, makes such a deduction. *In re Stewart's Properties, Inc.,* 41 B.R. 353, 355 (Bankr.D.Hawaii 1984). Only the third, *In re First Alliance Corp.,* 126 B.R. 589, 592 (Bankr.S.D.Cal.1991), discusses the issue at all, concluding that the post-petition rental payments by the Debtor should be deducted from the amount otherwise due under § 502(b)(6), on the basis of the following reasoning:

> FAC's post-petition rent payments should also be deducted from RBLP's maximum allowed claim. *See In re Stewart's Properties, Inc.,* 41 B.R. 353 (Bankr.D.Haw.1984), (where the court noted that the maximum amount allowable under old § 502(b)(7) [now § 502(b)(6)] was the rent for one year from the date of filing of the petition, minus administrative rent previously paid.) If post-petition rental payments were not subtracted from the maximum allowable claim, a debtor who ceased payment of rent immediately upon filing a bankruptcy petition would be in a better position than a debtor who fulfilled his duties under § 365(d)(3). Such a result could not have been intended. The legislative history of § 502(b)(6) states that "this subsection does not apply to limit administrative expense claims for

use of the leased premises to which the landlord is otherwise entitled." House Report at 6309–6310.

The *First Alliance* court therefore concludes that the deduction of post-petition payments is logical because it provides an incentive to debtor-tenants to pay post-petition rents.

The *First Alliance* court cites, with approval, 126 B.R. at 591, 592, the reasoning of *In re Goldblatt Bros., Inc.*, 66 B.R. 337 (Bankr.N.D.Ill.1986), with respect to § 502(b)(6). In *Goldblatt*, the court held that post-petition rental payments received from successor tenants to the debtor should not be deducted in making the § 502(b)(6) calculation. *Id.* at 346–47. In reaching this conclusion, the *Goldblatt* court reasoned that § 502(b)(6) was merely a means of measuring the maximum claim of the landlord, after the damages otherwise allowable are computed under state law. *Id.* at 347, 346. *Accord, In re Thompson*, 116 B.R. 610, 613 (Bankr. S.D.Ohio 1990).

We also agree with the *Goldblatt* analysis. As we read § 502(b)(6), it sets forth a mechanical method for calculating the landlord's maximum damages, which is dependent only upon the terms of the parties' lease, not upon the particular post-petition behavior of a debtor-tenant or successor-tenants to the debtor. Therefore, as the post-petition payments by the successor-tenants were deemed irrelevant to the calculation pursuant to § 502(b)(6) in *Goldblatt*, the post-petition payments of the Debtors should likewise be irrelevant to the § 506(b)(6) calculation.

The *First Alliance* court does not appear to recognize the inconsistency of its result with that reached in *Goldblatt*. Furthermore, we cannot agree with *First Alliance's* suggestion that a contrary interpretation of § 502(b)(6) would encourage debtor-tenants not to make the rental payments mandated by 11 U.S.C. § 365(d)(3). The latter Code section requires debtors to make post-petition rental payments if they choose to remain in possession of rented premises, irrespective of whether the lease for the premises is ultimately assumed or rejected. While § 365(d)(3) does not spell out the consequences of a failure of a debtor to abide by its requirements, it is clear that the debtor-tenant who fails to pay post-petition rent is acting at its peril. A vigilant landlord should be able to obtain relief from the automatic stay if the debtor-tenant fails to pay, *see In re Reice*, 88 B.R. 676, 681–84 (Bankr.E.D.Pa.1988); *In re Grant Broadcasting of Philadelphia, Inc.*, 71 B.R. 891, 900–01 (Bankr.E.D.Pa. 1987); and *In re DeSantis*, 66 B.R. 998, 1001–02 (Bankr.E.D.Pa.1986), and will often be entitled to subsequent immediate payment of rents not paid in conformity with § 365(d)(3). *See In re U.S. Fax, Inc.*, 114 B.R. 70, 73–74 (E.D.Pa.1990); *In re Orient River Investments, Inc.*, 112 B.R. 126, 132–34 (Bankr.E.D.Pa.1990); and *In re Dieckhaus Stationers of King of Prussia, Inc.*, 73 B.R. 969, 973 (Bankr.E.D.Pa.1987). It is true that a landlord who is not vigilant may end up with neither relief nor rents, if the debtor becomes insolvent. *Orient River, supra,* 112 B.R. at 133–34. However, it is very doubtful that a prudent debtor-tenant would refuse to comply with § 365(d)(3) just to reduce the landlord's ultimate claim. Nor is it appropriate to assume that any debtor should or would intentionally violate the express requirements of § 365(d)(3), or needs a special incentive not to do so. In our experience, debtors who violate § 365(d)(3) do so either because of some significant dispute with the landlord or simply lack of cash to pay.

The instant landlords have been equally as creative as the *First Alliance* court in putting forth hypothetical situations which suggest that their interpretation of § 502(b)(6) is logical. Suppose a debtor remains in possession, paying rent, for over a year, and then rejects the lease. Would it be fair to interpret § 502(b)(6) to deprive the landlord of *any* rejection damages? Why should the payments of a successor-tenant mitigate only the total state law damages and not affect the § 502(b)(6) rent cap, while payments of a debtor tenant would reduce the rent cap? These questions suggest that § 502(b)(6) can only logically be interpreted as a limit on damages which is dictated by the terms of the lease,

not the debtor's performance. The debtor's performance is relevant only to the measure of actual damages under applicable state law, to which the § 502(b)(6) limit must then be applied. We therefore conclude that the landlords are correct in asserting that the debtor's post-petition rent payments may not be deducted in application of § 502(b)(6).

2. *Nevertheless, the Debtors are Entitled to Enforce the Prior Agreement of Two Landlords to Reduce Their Claims by the Amount of the Debtors' Post-Petition Payments.*

■ The foregoing conclusion requires us to decide whether the two landlords whose representative paralegal agreed to accept the Debtors' calculations are bound to their agreement. We find that they are.

As Judge Fox cogently stated in *In re Paolino*, 78 B.R. 85, 89 (Bankr.E.D.Pa. 1987),

[i]t is well settled that a trial court has jurisdiction to enforce a settlement agreement made by litigants in a pending case. The jurisdiction is founded on the strong public policy which favors the settlement of disputes and avoidance of costly and time consuming litigation. *E.g., Pugh v. Super Fresh Food Markets, Inc.*, 640 F.Supp. 1306 (E.D.Pa. 1986); *Rosso v. Foodsales, Inc.*, 500 F.Supp. 274 (E.D.Pa.1980). A settlement agreement is contractual in nature; the essential ingredient of a binding agreement is the parties' mutual assent to the terms and conditions of the settlement. *See Macy v. United States*, 557 F.2d 391 (3d Cir.1977); *Pugh.* "An agreement to settle a lawsuit, voluntarily entered into, is binding upon the parties, whether or not made in the presence of the court, and even in the absence of a writing." *Morris v. Gaspero*, 522 F.Supp. 121 (E.D.Pa.1981), *quoting Green v. John H. Lewis & Co.*, 436 F.2d 389, 390 (3d Cir. 1970); *accord, Good v. Pennsylvania Railroad Co.*, 384 F.2d 989 (3d Cir.1967). The agreement remains binding even if a party has a change of heart after he agreed to its terms but before the terms are reduced to writing. *E.g., Pugh.*

In speaking of the circumstances under which a party can extricate itself from a settlement, we observed in *In re United Church of the Ministers of God*, 84 B.R. 50, 53 (Bankr.E.D.Pa.1988), that

[t]he principles of law pertinent to such circumstances are well-stated in a district court Opinion written by present Circuit Judge Edward R. Becker in *United States v. Kulp*, 365 F.Supp. 747, 763 (E.D.Pa.1973), *aff'd*, 497 F.2d 921, 922 (3d Cir.1974). Although finding that such stipulations are generally enforceable, Judge Becker held that

"[a] court may allow a party to withdraw from a stipulation if the moving party can prove that he relied to this detriment on representations that were untrue, or that the stipulation stemmed from fraud, accident, mistake, inadvertence, surprise, or excusable neglect, or that some other reason justifies relief. *See Norwich Pharmacal Co. v. Rakway, Inc.*, 189 F.Supp. 348 (E.D.Pa.1960); *Rarick v. United Steelworkers of America*, 202 F.Supp. 902 (W.D.Pa.1962)."

*See also, e.g., United States v. Camp*, 723 F.2d 741, 745–46 (9th Cir.1984); *Coastal States Marketing, Inc. v. Hunt*, 694 F.2d 1358, 1369 (5th Cir.1983); *Jacintoport Corp. v. Greater Baton Rouge Port Comm'n*, 599 F.Supp. 21, 23 (M.D.La.1984), *rev'd on other grounds*, 762 F.2d 435 (5th Cir.1985), *cert. denied*, 474 U.S. 1057, 106 S.Ct. 797, 88 L.Ed.2d 774 (1986); and *Albee Homes, Inc. v. Lutman*, 274 F.Supp. 875, 877 (E.D.Pa. 1967), *aff'd in part and appeal dismissed in part*, 406 F.2d 11 (3d Cir.1969).

The landlords in issue made firm, unambiguous, and complete settlements with the Debtors. There are no claims of misrepresentations by the Debtors, nor any allegations which rise to the level of "fraud, accident, mistake, inadvertence, surprise, or excusable neglect." The landlords in issue agreed to terms which were consistent with those agreed to by about half of the other landlords, and arguably were supported by the only reported bankruptcy case on point (*First Alliance*). Their rea-

son for attempting to repudiate these agreements appear to be, purely and simply, a change of heart, though doubtless a change of heart motivated by Philadelphia counsel's enlightenment. The fact that Philadelphia counsel represented these landlords at an earlier stage did not establish a prerequisite, especially in light of the apparently equal bargaining power of the parties, that the Debtors seek out the approval of the settlement of these landlords' claims from Philadelphia counsel. Rather, it was the duty of the landlords to consult with counsel of their choice. These landlords having entered into this agreement without choosing to consult their Philadelphia counsel is no basis to set aside the agreement reached by their authorized representative.

In sum, if settlements are to receive their due respect and consideration, they cannot be so easily undermined as these landlords suggest. We therefore conclude that the two landlords who agreed to terms with the Debtors by the letter agreement of July 22, 1991, are bound to those terms, despite our previous holding which would have expanded their rights.

3. *Utility Charges Which the Lease Expressly States are Part of the Rent and Which are Imposed in a Manner Similar to Rent May Be Included as "Rent Reserved" in § 502(b)(6) Calculations.*

■ The final issue requires us to determine precisely what is "rent reserved" under § 502(b)(6). In support of their claim that the utility charges in issue cannot be included in the "rent reserved," the Debtors cite *In re Heck's, Inc.,* 123 B.R. 544, 546 (Bankr.S.D.W.Va.1991) ("*utility charges,* janitorial expenses, ... costs of keys, electrical repairs and a sign are elements of damages, but not elements of rent") (emphasis added); and *In re Storage Technology Corp.,* 77 B.R. 824, 825 (Bankr. D.Colo.1986) (attorney's fees not allowed "[e]ven though the parties defined 'rent reserved' as including attorney's fees," because such charges do not relate to use of the property). In support of their position that the utility charges in issue should be

included within the term "rent reserved," the landlords can muster only dictum from *In re United Cigar Stores of America, Inc.,* 86 F.2d 629, 633 (2d Cir.1936), *cert. denied,* 300 U.S. 679, 57 S.Ct. 671, 81 L.Ed. 883 (1937) (charges for repair and maintenance might be so "regular" as to be regarded as rent); and *In re Parkview–Gem, Inc.,* 465 F.Supp. 629, 634 (W.D.Mo.1979) (payments for maintenance, insurance, and utilities, as opposed to remodelling expenses, might be considered as rent).

■ Despite their lack of precedential support, we believe that the landlords are entitled to prevail on this issue on the basis of the clear meaning of the terms in the context of these particular leases, as they did on the first issue in question due to the clear meaning of the pertinent Code language. Article 5E of the lease in issue specifically categorizes the contested utility charges as "additional rent." This categorization does not appear forced or illogical, as the utility charges in issue were fixed, regular monthly payments, exactly like the "true rent" itself. In fact, they constituted between twelve (12%) percent and slightly over thirteen (13%) percent of the regular monthly payments due from the tenants in issue. *See* page 451 n. 1 *supra.* It is true that the language of Article 5E almost proves too much, by purporting to classify *all* charges to the tenants as "additional rent." However, the landlords conceded (and we think properly) that sums of money due under the lease in only certain contingencies, such as attorney's fees, would not be properly classifiable as "rent reserved," irrespective of what the leases attempted to say, since such charges are neither fixed nor regular. Therefore, we conclude that appendages to "pure" rent are allowable as "rent reserved" under § 502(b)(6) only if the lease expressly so provides *and* the charges in question are properly classifiable as rent because they are regular, fixed, periodic charges payable in the same way as "pure" rent. Both of these requirements are met here.

In *Storage Technology,* the attorney's fees in issue were apparently categorized as "rent" in the parties' lease. 77 B.R. at

824. However, as the instant landlords conceded, such charges were not regular, fixed monthly charges and therefore were not properly classifiable as "rent reserved." It is unclear whether any of the charges found to be non-rent in *Heck's* were designated as rent in the parties' lease. In any event, the reference to "utility charges" in issue in *Heck's* was vague and lumped with other charges which clearly were not the sort of regular, fixed, substantial monthly charges as are in issue here. Therefore, both *Heck's* and *Storage Technology* present factual scenarios which are significantly distinguishable from those at issue in the instant case. We therefore decline to apply the holdings of these cases to the instant facts, and conclude that the utility charges in issue here are a component of the "rent reserved" in the leases in question under § 502(b)(6).

At the hearing on July 31, 1991, the Debtors presented us with an "omnibus order" which would have not only determined the outcomes of numerous other Objections to proofs of claims which were apparently uncontested, but also would have resolved the issues addressed in this Opinion favorably to the Debtors. In this Opinion, we have rejected the two principal contentions of the Debtors. The parties advised us at oral argument on July 31, 1991, that they had agreed to the alternative mathematical calculations which could be plugged in upon our making decisions on these issues. We therefore will direct that the Debtors redraft the omnibus order to render it consistent with the conclusions reached in this Opinion, and we will execute same after a brief period to allow other interested parties to make any objections to the form or content of the Debtors' draft has lapsed.