**In re MAIN, INC., Debtor.**

**In re Eric J. BLATSTEIN, Debtor.**

**Bankruptcy Nos. 96–19098DAS, 96–31813DAS.**

United States Bankruptcy Court, E.D. Pennsylvania.

April 23, 1997.

Steven M. Coren, Philadelphia, PA, for 718 Arch St. Associates.

Mary F. Walrath, Philadelphia, PA, for Corporate Defendants in Adversary Proceedings.

W.J. Winterstein, Jr., Philadelphia, PA, for Morris Lift.

Kevin J. Carey, Mesirov, Gelman, Jaffe Cramer & Jamieson, Philadelphia, PA, for Lori Blatstein.

Frederic Baker, Philadelphia, PA, Ass't. U.S. Trustee.

## OPINION

DAVID A. SCHOLL, Chief Judge.

### A. INTRODUCTION

The instant Objections to claims of over $3 million filed by 718 Arch Street Associates, Ltd. ("Arch"), in its capacity as landlord, require us to interpret 11 U.S.C. § 502(b)(6), which provides a mathematical means of computing a cap on damages resulting from termination of a debtor-tenant's lease of real property. Both parties ask us to adjust the cap to their advantage, Arch by integrating certain aspects of state court decisions on its claim, and the Debtor by requesting deductions for numerous factors, including unrefunded security deposits, rent received from a replacement tenant, a post-judgment garnishment, and compensation for allegedly unreturned personal property.

These arguments drive us to carefully examine the language of § 502(b)(6). Therein, we find that the cap, as opposed to the landlord's total damage claim which it limits, is to be computed solely on the basis of rent, with no adjustments. Accepting the objectors' calculations of the rent payable under the cap without adjustments, we conclude that the cap is $269,159.00. We will therefore sustain the objections in part and fix the landlord's claim at this figure as to both Debtors, one of which (the corporate Debtor) is liable only in the capacity as garnishee of the individual Debtor as putative tenant.

We also note that Arch consequently has standing to maintain adversary proceedings challenging fraudulent conveyances by both Debtors, the discharge of the individual Debtor, and the dischargeability of his debt to Arch. The trustee in the individual Debtor's case could, in any event, pursue the 11 U.S.C. § 727 aspect of that proceeding against the individual Debtor.

### B. PROCEDURAL AND FACTUAL HISTORY

MAIN, INC. ("Main") filed a voluntary Chapter 11 bankruptcy case on September 20, 1996. On November 7, 1996, Arch first made its presence known in these cases by filing a motion to dismiss that case. Prior to a hearing on Arch's motion, on December 6, 1996, Main filed a praecipe to voluntarily convert its case to a Chapter 7 case, and Arch withdrew the motion to dismiss. Mitchell W. Miller, Esquire, was appointed as Main's interim trustee.

ERIC L. BLATSTEIN ("Blatstein," with Main, "the Debtors"), who, with his nondebtor wife Lori ("Lori"), owns Main, filed a voluntary individual Chapter 7 bankruptcy case, initially *pro se*, on December 19, 1996. Michael H. Kaliner, Esquire, was appointed as interim trustee in Blatstein's case.

On January 3, 1997, Arch filed identical adversary proceedings ("the Proceedings") in both the Main and Blatstein cases. Named as defendants in the Proceedings were not only the Debtors, but also Lori; Morris Lift, the accountant for the Debtors who is the President of Main; and a number of other corporations owned by Blatstein and Lori which apparently own and operate clubs and restaurants on the Delaware River waterfront and at other locations in Philadelphia ("the Corporations"). The claims stated in the Proceedings are alleged fraudulent conveyances and a conspiracy to transfer the assets of the Debtors to the Corporations and possibly other entities to impede Arch's collection of its judgments, which have swelled to over $3 million against both Debtors; an objection to Blatstein's discharge pursuant to 11 U.S.C. §§ 727(a)(2), (a)(7); and a challenge of the dischargeability of Blatstein's debt to it under 11 U.S.C. § 523(a)(6).

On February 11, 1997, the original date for same, the trial of the Proceedings was continued until May 1, 1997, although this relisting was on a must-be-heard basis in light of the opposition of several of the defendants to any continuances. Thereafter, we were presented with several discovery disputes as the trial date neared, but these were dealt with by us as soon as possible after they arose, and it appears that the trial will be conducted as scheduled.

The Main case featured a contested trustee election in which Arch championed Kaliner in light of Kaliner's willingness to appoint

Arch's counsel as his own special counsel to prosecute the Proceedings as a co-plaintiff. This dispute was resolved when Miller also agreed to appoint Arch's counsel as his special counsel, at which point Arch withdrew its attempt to elect Kaliner in that case. On April 17, 1997, Arch moved to add Miller and Kaliner as parties plaintiff to the Proceedings, and the motions are scheduled to be heard on an expedited basis and likely to be granted on April 24, 1997.

On January 7, 1997, Arch filed several proofs of claim in the cases of Main and Blatstein, in the respective amounts of $3,190,298.10 and $3,398,408.30. The claim against Blatstein was based on a state court confessed judgment entered against him on November 13, 1992, in the amount of $2,774,-803.09 for breach of a lease of Arch's property for the operation of a large nightclub, known as the Phoenix. A judgment was entered against Main by default on November 19, 1993, in garnishment proceedings to collect on the claim against Blatstein.

In February 1997 the Debtors each filed objections to Arch's respective claims against them, averring principally that the claims should be reduced in light of the § 502(b)(6) cap. After one continuance, the matters were heard on April 15, 1997. In light of the Debtors' contention that the result could eliminate Arch's claim entirely and destroy its standing to prosecute the Proceedings, we insisted that any briefs to supplement pre-trial memoranda presented by the interested parties be submitted by April 22, 1997. We note that the joinder of Kaliner as a party plaintiff to the Proceeding stating, *inter alia,* § 727 claims against Blatstein renders at least that Proceeding viable irrespective of the outcome of the instant dispute. Our decision that Arch has a valid claim of $269,-159 *infra* renders any further consideration of the standing issue unnecessary.

Blatstein and Gie Liem, the sole shareholder of Growth Properties, Inc. which, through several intermediate entities, owns Arch, were the only witnesses at the hearing. The following facts emerged at the hearing.

The lease by which the Phoenix nightclub was operated had originally been executed in July 1987 and was between Arch and (apparently) Archco Enterprises, Inc. ("Archco"), a corporation owned by Blatstein, although the name of the "tenant" on the lease was blank and the lease was signed by Blatstein without any corporate designation. A security deposit of $6,416 was given to Arch by Archco at that time.

In March 1988, at the request of Arch, a new lease ("the Lease") was executed to permit Arch to increase the square footage of the leased property, without an increase in the rent, to assist it with its bank financing. The cover page, lack of identity of the tenant, and Blatstein's undesignated signature were the same as in the case of the prior lease. A security deposit of an additional $10,000 was paid in connection with the Lease.

In 1989 Archco filed a voluntary Chapter 11 voluntary bankruptcy case, which was assigned to the Honorable Bruce Fox. During that proceeding, Archco filed a motion to assume the Lease. Arch filed an answer which, without disputing Archco's status as the tenant, demanded that the arrearages be cured. An Order was entered by Judge Fox on March 8, 1989, authorizing Archco to assume the Lease.

Archco subsequently defaulted on the Lease and entered into an agreement to pay $5,000 weekly towards back rent in January 1992. Neither Blatstein nor Liem could recall whether any amount in addition to one $5,000 installment was delinquent as of the date that Blatstein and Archco attempted to surreptitiously remove their property from the premises on the night of April 6, 1992. Arch called the police and prevented Blatstein and/or Archco from removing the personal property owned by them from the premises. Blatstein testified that the value of the personal property, which, though, requested in a letter from his counsel, was never returned, had a fair market value of approximately $180,000.

In November 1992 Arch confessed judgment against Blatstein for all of the rent which could have been due under the Lease, which ran through the year 2003. It calculated the rent to be $2,774,803, including attorneys' fees and audit fees. Blatstein unsuccessfully petitioned to open the judgment

and this decision was affirmed by the Pennsylvania Superior Court on August 31, 1993, and not appealed further. The Superior Court's Memorandum accompanying an Order reported at 433 Pa.Super. 624, 636 A.2d 1223, rejects Blatstein's argument that the eviction was improper on the ground that Blatstein abandoned the premises when he attempted to remove his personal property therefrom.

The Landlord subsequently re-leased part of the premises to Illusions, Inc. ("Illusions") in July 1993. A security deposit of $11,000 and monthly rent of $5,500 commencing October 1993 was paid by Illusions. Illusions continued to pay rent to Arch until the premises were foreclosed upon by a mortgagee of Arch in October 1994. No adjustment to the judgment was effected on account of the personalty left on the premises, the security deposits, Illusions' rentals, nor Arch's loss of the property in foreclosure.

Arch also served garnishments on other corporations owned by Blatstein and Lori including Main. When Main failed to answer Interrogatories in Garnishment, Arch obtained a default judgment in the full amount of $2,774.803 against Main. As a result, Main's accounts were attached and Archco received $56,228.51 towards its judgments. Main's appeal from an unsuccessful petition to open the judgment in garnishment against it was affirmed in an unreported January 14, 1997, decision of the Superior Court, at No. 01849 Phila.1996, on the ground that the three-year delay after the entry of the judgment prior to the filing of the petition rendered it untimely. No credit for the garnishment was noted on the claims of Arch against either Debtor.

Arch argues that *res judicata* principles bar any defenses against Arch's claims which could have been raised in the state court litigation by Blatstein or Main, and resolve as a matter of law in this case any state law issues decided in state court relevant to the application of the cap. Arch contends that this judgment thus precludes, *inter alia,* the defenses that Blatstein was not the tenant, that it improperly retained the tenant's personalty, and efforts to deduct the unrefunded security deposits.

The Corporations, supported by the Debtors, submitted the following at the hearing:

## CALCULATION OF LANDLORD'S CLAIM

### I. PAST DUE RENT

Per Lease

| | |
|---|---|
| Base rent in year 5 (1992) | 100,691/yr. or 8,391/mo. |
| Expansion space in 1992 | 42,000 yr. or 3,500/mo. |
| Basement space in 1992 | 8,470/yr or or 706/mo. |
| Total | 12,597/mo. |

As of April 6, 1992, Archco was 1 week behind = $5,000

### II. ACTUAL CLAIM

Rent due until October, 1994, when Landlord lost Premises through foreclosure

| | | |
|---|---|---|
| 4/6/92–12/31/92 | $12,597 \times 9 = 113,373 - 2,519$ (4/1 to 4/6) = 110,854 | |
| 1/1/93–2/31/92 | 134,748 + 60,900 + 9,075 = 204,723 | |
| 1/1/94–9/30/94 | 3/4 (134,748 + 60,900 + 9,680) = 153,996 | |
| | TOTAL = $469,164 | |

### III. SECTION 502(b)(6) CAP

#### A. ONE YEAR'S RENT

Monthly rent as of termination in 1992 was $12,597 for period from April, 1992, through December, 1992 Monthly rent for January, 1993, through March, 1993, was $15,680.78

Total cap =
$(9 \times 12,597) + (3 \times 15,680.78) = $160,415$

#### B. 15% OF BALANCE OF TIME UNDER THE LEASE

Remaining term of lease ran from 4/6/92 to 12/31/03 or 139.8 mo.
15% of the remaining term 139.8 mo. $\times$ .15 = 20.97 mo.
Total cap of 15%
$20.97 \times 12,597 = $264,159$

TOTAL CAP IS GREATER OF THE TWO OR $264,159

### IV. DEDUCTIONS FROM CLAIM

| | |
|---|---|
| Security deposit under Archco Lease | 6,416 |
| Security deposit under Amendment | 10,000 |
| Personal property retained by Landlord | 180,000 |
| Rent received from New Tenant | |
| Security deposit | 11,000 |
| Rent (10/93–10/94 @ 5,500/mo) | 66,000 |
| Garnished Funds | 56,229 |
| **TOTAL DEDUCTIONS FROM CLAIM** | **$329,645** |

| TOTAL CLAIM | |
|---|---|
| PAST DUE RENT | $ 5,000 |
| ACCELERATED RENT CAP | $264,159 |
| SUBTOTAL | $269,159 |
| LESS DEDUCTIONS | −$329,645 |
| TOTAL CLAIM | −$(60,486) [OR 0] |

Arch, meanwhile, conceding that the § 502(b)(6) cap required reduction of its claim against Blatstein despite its judgments,

submitted the following calculations based upon its judgments in its trial memorandum:

| | | |
|---|---|---|
| Total Judgment: | $2,774,803.09 | |
| Past Due, 11/92: | ($ 122,253.31) | |
| Rent, 11/92–4/93: | ($ 101,963.45) | |
| Atty. Fees: | ($ 132,133.48) | |
| Audit Costs; | ($ 1,560.00) | |
| Future Rent: | $1,416,892.90 | |
| $2,416,892.90 × 15% = | $362,533.93 of allowable future rent. | |
| The total claim is: | $362,533.93 | (Allowed Future Rent) |
| | $224,216.76 | (rent through April, 1993) |
| | $132,133.48 | (Attorney's fees) |
| | $718,884.17 | (Total Allowed Claim) |

(Footnotes omitted)

Arch further argued that no § 502(b)(6) adjustment was appropriate as to Main because its claim against Main as garnishee was "unrelated" to its rent claim against Blatstein.

## C. DISCUSSION

The Code provision at issue, 11 U.S.C. § 502(b)(6), reads as follows:

> (b) ... if [an] objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount except to the extent that—
>
> .    .    .    .    .
>
> (6) if such claim is the claim of a lessor for damages resulting from the termination of a lease of real property, such claim exceeds—
>
> (A) the rent reserved by such lease, without acceleration, for the greater of one year, or 15 percent, not to exceed three years, of the remaining term of such lease, following the earlier of—
>
> (i) the date of the filing of the petition; and
>
> (ii) the date on which such lessor repossessed, or the lessee surrendered, the leased property; plus
>
> (B) any unpaid rent due under such lease, without acceleration, on the earlier of such dates;
>
> .    .    .    .    .

The efforts of both parties to argue that adjustments must be made to the § 502(b)(6) figure on account of Arch's pre-petition judgment and the objectors' various claims that credits are in order for security deposits, personality allegedly retained, rent received from replacement tenants and from garnishment, and the ultimate foreclosure of the rented property cause us to focus clearly on the purpose and language of § 502(b)(6).

The purpose of § 502(b)(6) is to place a cap on a creditor landlord's claims otherwise contractually due on account of a lease termination. The cap is clearly not a provision which measures the landlord's claim in all cases, but merely an alternative to the normal claim resolution process, under state landlord/tenant and any other applicable law, which provides a limit in the event that a creditor landlord's claim otherwise would exceed the cap figure.

The language of § 502(b)(6) makes reference only to the rent due under the parties' lease as a basis for its ascertainment. The cap is therefore to be calculated solely on the basis of the rent due under the lease, and not on the basis of other considerations which might legitimately be considered in the normal claim resolution process. Other items, such as the amount of a judgment and allowances for security deposits, rent received from new tenants and garnishment, and value of personality converted by a landlord, while arguably relevant to the determination of a landlord's claim in the normal claims process, have nothing to do with calculation of the cap. *See In re All for a Dollar, Inc.*, 191 B.R. 262, 264–65 (Bankr.D.Mass. 1996) (post-petition rentals are deductible from the state law damage claim calculation but not from the cap); and *In re Iron–Oak Supply Corp.*, 169 B.R. 414, 419–20 (Bankr. E.D.Cal.1994) (mitigation of a landlord's damage in the nature of future rents is an available defense under nonbankruptcy law calculations, but not in calculating the § 502(b)(6) cap); and *In re Allegheny Int'l, Inc.*, 136 B.R. 396, 401 (Bankr.W.D.Pa.1991), *aff'd*, 145 B.R. 823 (W.D.Pa.1992) ("Section 502(b)(6) does not provide a formula for ascertaining the total nonbankruptcy damages.").

Although the foregoing principles seem fairly basic, they not only are not applied by the parties in their arguments, but also they were not applied by this court in its recent decision in *In re Scott Rothman*, 1997 WL

9994, at *5–*7 (Bankr.E.D.Pa. January 7, 1997). In that decision, while we properly ignored the state court judgment in making the § 506(b)(6) calculation, *see, e.g., In re Lindsey,* 199 B.R. 580, 583–84 (E.D.Va.1996); *Kohn v. Leavitt–Berner Training Corp.,* 157 B.R. 523, 526–27 (N.D.N.Y.1993); *In re Fifth Avenue Jewelers, Inc.,* 203 B.R. 372, 381–82 (Bankr.W.D.Pa.1996); *In re Fulton,* 148 B.R. 838, 843 (Bankr.S.D.Tex.1992); and *In re Bus Stop, Inc.,* 3 B.R. 26, 27 (Bankr.S.D.Fla. 1980), we erroneously muddled a discussion of the rents received from a replacement tenant and other equitable considerations with our § 502(b)(6) calculation.

In so doing, we failed to adhere to the language of the statute, as we had done in our previous decision considering § 502(b)(6) at some length, *In re Conston Corp.,* 130 B.R. 449, 452–54 (Bankr.E.D.Pa.1991). There, we correctly recognized that post-petition rental payments by the debtor were not referenced in the computation of the cap and hence could not be considered in this calculation.

■ We recognize that leases can often be adhesion contracts drafted by landlords, which attempt, for a variety of reasons which could include an awareness of § 502(b)(6), to define items which are not actually rent as "rent." One example is attorneys' fees. *See In re Q–Masters, Inc.,* 135 B.R. 157, 161 (Bankr.S.D.Fla.1991). However, we limited the appendage of attorneys' fees to situations where such charges were expressly included as part of the rent in *Conston, supra,* 130 B.R. at 455–56. We would now further refine this holding by stating that attorneys' fees due to a landlord to collect a rent deficiency are in no sense "rent," as defined by § 502(b)(6). *See also, Lindsey, supra,* 199 B.R. at 586.

In *Fifth Avenue, supra,* 203 B.R. at 380–81, the court engages in a discussion as to what is "rent" for purposes of the cap, and concludes that only "fixed, regular, and/or periodic" real estate taxes, insurance, and common maintenance charges ("CAM's") are included in the cap, excluding therefrom liquidated damages, service charges and reletting costs, and interest on any state court judgment. *Id.* at 381. We would probably be inclined to include no more than the CAM's as an item of "rent" in performing a § 502(b)(6) calculation. The other items do not appear in line with what we believe is the narrow category of "rent" alone.

■ We disagree with Arch's contention that Main's status as garnishee should exempt the application of the cap to determination of Arch's claim against it. It is undisputable that the claim against Main is based upon a claim of damages against Blatstein resulting from the termination of the Lease. Arch's claim against Main as garnishee must be "regarded as claiming through the debtor, as having received an equitable assignment of the debt, property or thing attached," 13 STANDARD PA.PRACTICE 2d 332 (1996) ("SPP") (footnotes omitted), and "must not exceed the amount," *id.* at 387–88, of Arch's claim against Blatstein. *See* Pennsylvania Rule of Civil Procedure ("Pa.R.Civ.P.") 3146(b) ("no money judgment entered against the garnishee shall exceed the amount of the judgment of the plaintiff against the defendant"); and *Johnson v. Beane,* 420 Pa.Super. 193, 200, 616 A.2d 648, 652 (1992), *aff'd,* 541 Pa. 449, 664 A.2d 96 (1995).

■ Thus, if the claim of Arch against Blatstein were reduced or eliminated by its satisfaction or payments by a third party such as another garnishee, or a bankruptcy discharge of Blatstein, we do not believe that Arch's claim against Main as garnishee would survive. While we acknowledge the principle that Main cannot set up a defense to the garnishment not asserted by Blatstein, *see* Pa.R.Civ.P. 3145(b)(2); and SPP, *supra,* at 375, a garnishee can assert certain defenses on the debtor's behalf, *id.* at 375–77, and it would be grossly inequitable to deprive Main of the benefit of the cap (a defense, if you will) which is not only available to Blatstein, but also has been successfully invoked herein, by the primary obligor, Blatstein. This principle seems particularly appropriately applied where the primary obligor is also a debtor whose claim is also reduced under § 502(b)(6). It has been applied in the circumstances of guarantors even where the principal obligors were not themselves debt-

ors. *See In re Episode USA, Inc.,* 202 B.R. 691, 694–96 (Bankr.S.D.N.Y.1996).

■ We would also point out that the language of § 502(b)(6), which we have held throughout this decision must be carefully and literally construed, applies to all claims for damages resulting from the termination of leases. Arch's claims against Main result from the termination of the Lease, albeit that it is a lease with another party, and hence it fits within the scope of the language of § 502(b)(6).

■ The calculation of the § 502(b)(6) cap figure is therefore simpler than the parties to this dispute made it out to be. The Corporations' calculation of the cap of the total rent reserved, pursuant to § 502(b)(6)(A), at $264,159, appears accurate. However, none of the adjustments proposed by either side appear appropriate.

■ The burden of proving the amount of the unpaid rent due under § 502(b)(6)(B) was clearly upon Arch. *See In re Allegheny Int'l, Inc.,* 954 F.2d 167, 173 (3d Cir.1992); and *In re Lewis,* 80 B.R. 39, 40–41 (Bankr.E.D.Pa. 1987). Liem was unable to establish the presence of an unpaid rent claim larger than the $5,000 unpaid weekly installment and Blatstein did not acknowledge any higher figure. The cap is therefore calculated as $264,159 plus $5,000 in unpaid rent, or at $269,159.

■ The defenses asserted by the Debtors may have been relevant to the calculation of Arch's damages under state law. Unfortunately for the Debtor, they are confronted by Arch's judgment of $2,774,803.09 against both of them, which they have unsuccessfully pursued on an appellate level in the state courts. No fraud or lack of jurisdiction in the state court proceedings has been proven, rendering these decisions, as Arch contends, binding under principles of *res judicata. See In re Kovalchick,* 175 B.R. 863, 871–73 (Bankr.E.D.Pa.1994); and *In re Garafano,* 99 B.R. 624, 629–34 (Bankr.E.D.Pa.1989). *Compare In re Road Patch Services, Inc.,* 154 B.R. 869, 872 (Bankr.E.D.Pa.1993) (confessed judgment regarding which the defendant did not litigate its defenses in a petition to open in state court may be unconstitutional). While arguably certain of the defenses, *e.g.,* the identity of the tenant as Archco or Blatstein, *but cf. In re Rothman,* 204 B.R. 143, 155 (Bankr.E.D.Pa.1996) (Blatstein may be liable because he signed the lease as an individual), the deduction of the replacement rentals and the sums garnished, and possibly the loss of personal property, might have been raised by state court to reduce Arch's mammoth claims, the Debtors are now barred from asserting such defenses in the state courts by principles of *res judicata.* These state court decisions were rendered after Archco's assumption of the Lease in the course of its bankruptcy. It seems clear that the state-law damage claims would greatly exceed the statutory cap of $269,159, even were some of these adjustments made, and Arch's claims therefore will not be reduced below the cap on account of these defenses.

## D. CONCLUSION

The claims of Arch against each of the Debtors will be reduced to $269,159 in the accompanying Order. The trial of the Proceedings will accordingly proceed on May 1, 1997, as scheduled.