**In re McLEAN ENTERPRISES, INC., Debtor.**

**Bankruptcy No. 87–03196–S–2–11.**

United States Bankruptcy Court, W.D. Missouri, S.D.

Oct. 2, 1989.

See also, Bkrtcy., 98 B.R. 485.

Gene A. DeLeve, Kansas City, Mo., for debtor.

James A. Lodoen, Lindquist & Vennum, Minneapolis, Minn., for H.J. of Burnsville.

## MEMORANDUM OPINION AND ORDER

FRANK W. KOGER, Chief Judge.

### I. Introduction

On February 1, 1989, pursuant to Rule 3007 and 11 U.S.C. section 502(a), Mclean Enterprises, the debtor-in-possession herein, objected to the claim of creditor H.J. of Burnsville, as amended. As required by 11 U.S.C. section 502(b), a hearing regarding the debtor's objections was held on May 9 and 10, 1989. This memorandum constitutes this Court's findings of fact and conclusions of law regarding the debtor's objections to the claim of H.J. of Burnsville.

### II. Findings of Fact

Pursuant to 11 U.S.C. section 303, An Involuntary Petition was filed against Mc-Lean Enterprises, Inc. (hereinafter "the debtor") on July 27, 1987. On September 1, 1987, by order of this Court, the proceedings were converted to reorganization under Chapter 11, Title 11, United States Code. Since that time, the debtor has continued in possession of its business and assets as a debtor-in-possession. On February 23, 1988, H.J. of Burnsville (hereinafter "H.J."), filed a proof of claim against the debtor's estate (Claim No. 55). On March 3, 1988 and May 8, 1989, H.J. filed amendments to the above proof of claim (Claim Nos. 57, 142).

H.J.'s claims are based upon a lease which ran from September 21, 1972 through August 31, 1998. Pursuant to this agreement, H.J. leased the Howard Johnson Motor Lodge (hereinafter "the motel") in Burnsville, Minnesota to Mclean Enterprises, Inc. Under the terms of the lease, the debtor was to pay H.J. 27% of the motel's gross room and licensee revenues. These fees were payable the 15th of each month following receipt of the revenues. Debtor also assumed the obligation to pay all real estate taxes.

Revenue at the motel had declined from $1,147,221 for 1984–85 to $925,400 for 1985–1986. Room revenue for 1986–87 was $652,977. Revenue, and therefore rent on the leasehold, had declined because additional motels had moved into the area which were causing a drain on business. Loss in revenue is also attributed to construction of a building next to the motel which blocked the view of the motel from patrons traveling on the nearby principal thoroughfare. The occupancy rate was declining at a steady rate and the debtor contends if the same progression had continued, the occupancy rate would have been zero by the end of the lease, an allegation the Court believes somewhat exaggerated.

On September 14, 1987 debtor and H.J. entered into a Agreement stipulating that the unexpired lease would be terminated and rejected as between H.J. and the debtor. H.J. entered into this Agreement after

being advised by the debtor that the debtor intended to stop operating the property. The Agreement between the parties stipulates in pertinent part that 1) the lease would be terminated in all respects effective 12:00 p.m. on September 14, 1987; and 2) the debtor would reject the lease pursuant to section 365(a) of the Bankruptcy Code as of 12:00 p.m. on September 14, 1987.

H.J. assumed possession of the property on September 14, 1987. H.J. thereafter operated and maintained the property until it was sold on January 19, 1988. During this period, H.J. received all motel income and revenues, and was responsible for all motel losses. From September through January, the motel was operated with a net operating loss of $70,825. In addition to losing these funds, H.J. also lost the profits it was entitled to under the lease Agreement.

H.J. received room revenues of $7,945.56 for banquet rooms and $110,519.55 for motel rooms during this period. After assuming operation of the motel, H.J. attempted to both relet and sell the property. It is customary in the motel industry to calculate the sale value of a motel by multiplying the average, annual room revenue (as determined by the average, daily occupancy and room rates) by three.

The average, daily occupancy rate for 1986–87 of 38.2%, and the average, daily room rate for this time of $43.43, produce an average, annual room revenue of approximately $1,659.03 per day, or $605,544.49 per year. Using this calculus, the fair market value of the property was $1,816,633.40. On November, 10, 1987, H.J. sold the motel to the Royale Hospitality Group, Inc. for $2,620,000.

### III. Discussion of Debtor's Arguments

H.J.'s Amended Proof of Claim in the amount of $802,109.71 raises the following claims against the debtor and the estate:

| Claim | Total |
|---|---|
| I. Unpaid, prepetition lease payments; real estate taxes; and tax penalties | $ 104,457.85 |

(subtotals)
a. Lease payment, June 1–30, 1987 = $ 12,576.33
b. Lease payment, July 1–27, 1987 = $ 16,048.88
c. Real estate tax, Jan. 1–July 27, 1987 = $ 66,079.52
d. Tax penalty through July 27, 1987 = $ 9,753.12

| II. Damages from the rejection and termination of the lease | $ 643,579.53 |

(subtotals)
a. Lost income, Sept. 14–Jan. 1, 1988 = $ 94,588.30
b. Filing fees = $ 1,711.00
c. Professional fees regarding lease rejection, bankruptcy, and sale of the property = $ 24,837.89
d. Leasehold purchases of defaulted leases necessary to sell the property = $ 20,220.00
e. Howard Johnson's Franchise fee necessary to sell property = $ 20,000.00
f. State deed tax = $ 3,415.50
g. Closing/disbursement fee = $ 400.00
h. Late mortgage charges = $ 8,122.84
i. Estimated decline in land value of property resulting from damages/decline in profitability of property while operated by Mclean and H.J. = $ 400,000.00
j. Operating loss (Sept. 14–Jan. 18, 1988) = $ 70,825.00

| III. Gap priority claim pursuant to 11 U.S.C. sections 502(f) and 507(a)(2) | $ 42,120.02 |

Claim                                                    Total

IV.   Administrative claim pursuant to 11 U.S.C. sections
        503(b)(1)(A) and 507(a)(1) ................................. $11,952.31
      (subtotals)
      Lease payments, Sept. 1–13, 1987 = $ 7,212.77 (554.82846 per
        day)
      Real Estate tax, Sept. 1–13 = $ 4,129.97
      Real Estate tax penalty = $ 609.57

---

Based on its post trial memorandum in support of its objections to these claims, as well as statements at the hearing on objections, it appears the debtor's objections to H.J.'s claims are limited to challenging HJ's claim for post-petition damages arising from rejection of the lease. (See, Section II of Claims, infra).

In its objection to HJ's claims, the debtor asserts several reasons why HJ's claim for post-petition damages should be rejected. These challenges may be summarized as follows: a) debtor alleges that HJ is not entitled to recovery of post-rejection damages because HJ consented to the termination of the lease, or surrendered the lease and leasehold estate, thus extinguishing all of the debtor's legal duties and obligations regarding the lease; b) debtor asserts that "rejection" of the lease under section 365 precludes H.J. from enforcing any remedy for "termination" of the lease; c) debtor contends that HJ has failed to adequately meet its burden of proving its claim for damages in the manner required by 11 U.S.C. section 502(b)(6) and *City Bank Farmer's Trust Company v. Irving Trust Company*, 299 U.S. 433, 57 S.Ct. 292, 81 L.Ed. 324 (1937); and d) debtor's final thrust at HJ's postpetition claim attacks the size of the award which HJ seeks. Specifically, the debtor argues that HJ's was only deprived of rental income under the lease in an amount equal to $31,985.58, and suffered no decline in the land value of the property due to debtor's rejection of the lease. In conclusion, debtor adds that H.J.'s post-petition claim, which arises as a consequence of the parties agreed rejection of the lease, exceeds the limitation on such damages imposed by 11 U.S.C. section 502(b)(6).

### III.(a)   Consent and Surrender

■ Debtor's first objection to H.J.'s claim asks this Court to decide whether the Agreement between the landlord and the debtor to reject and terminate the lease operates to extinguish all of the debtor's legal duties regarding the lease. Debtor asserts that HJ is not entitled to recover post-rejection damages under sections 502(b)(6) and 502(g) because H.J. consented to the termination, thus extinguishing all of H.J.'s claims against the estate flowing from breach of the lease agreement.

The Agreement between the debtor and its landlord is not clearly worded and is subject to divergent interpretations. The Agreement, dated September 14, 1987, is titled "Stipulation Terminating and Rejecting Unexpired Lease Between McLean Enterprises, Inc. and HJ of Burnsville." The language of this document notes that the parties agree that "[the lease] is hereby terminated in all respects" and "Mclean hereby rejects the Lease pursuant to section 365(a) of the Code." Both the termination and rejection went into effect by agreement at 12:00 p.m. on September 14, 1987.

In its September 15 "Motion to Approve Stipulation and For Authority to Reject Unexpired Lease," Mclean limits its discussion to the seeking this Court's approval to reject the lease agreement with H.J. No mention is made of termination. Finally, the "Revised Order Authorizing the Rejection of Unexpired Lease Between Mclean Enterprises, Inc. and HJ of Burnsville," which was approved by this Court on December 7, 1987, authorizes Mclean to reject the lease, but also authorizes "termination" of the agreement.[1]

---

**1.**  NOW, THEREFORE, IT IS ORDERED, that Mclean Enterprises, Inc. shall be and hereby is authorized to reject the Lease, effective as of

12:00 noon on September 14, 1987, and that the following described instrument is terminated: Lease to Mclean Enterprises, Inc. pursuant to

■ Any attempt by a bankruptcy court to decipher the language in a written instrument affecting the rights of the parties must conform to state law. *In re F.A. Potts and Co., Inc.*, 42 B.R. 712 (Bankr.E.D.Pa. 1984), (Applying New Jersey law to contract interpretation problem) *In re Trammel*, 63 B.R. 878 (Bankr.E.D.Va.1986) (Using Virginia Parol Evidence Rule in controversy regarding agreement for purchase of property). Under Minnesota law, if a written agreement is ambiguous, extrinsic evidence ·may be considered to determine the meaning of the language contained therein. *National Farmers Union Property and Cas. Co. v. Anderson*, 372 N.W.2d 71 (Minn.App.1978). No writing upon which the rights of the parties depend can be read in the abstract: the circumstances surrounding a writing are admissible to aid in interpreting the meaning of the writing. *Clark v. Crossroads Center, Inc.*, 285 Minn. 173, 172 N.W.2d 560 (1969). The weight of the evidence convinces this Court that H.J. did not intend the Agreement between it and the debtor to operate as a waiver, bar, or rejection of its remedies against the debtor for the debtor's rejection of the lease.

At first glance, it is difficult to ascertain what the parties intended the effect of the stipulation to be due to the aforementioned conflicting use of the words "rejection" and "termination". However, correspondence between counsel for the parties reveals that the sole purpose of including the "termination" language was to make the Agreement comply with Minnesota real estate title requirements. (Debtor's Exh. No. 4). Absent any clear evidence of contrary intent, this Court finds that the Agreement between the landlord and debtor constituted a rejection of the lease pursuant to 11 U.S.C. section 365(a). Further, this Court

the Declaration of Lease dated June 30, 1980, filed August 20, 1980, as Document No. 111484; which Lease covers all or a portion of certain real property located in Dakota County, Minnesota, legally described as Lot 5, Block 1 River Ridge Addition. Revised Order Authorizing the Rejection of Unexpired Lease Between Mclean Enterprises, Inc. and H.J. of Burnsville, *In re Mclean Enterprises, Inc.*, No. 87–03196–S2–11, Dec. 7, 1987.

finds that the use and effect of the word termination was intended solely to bring the Agreement into conformity with Minnesota law and was not intended by the landlord to be a waiver, express or implied, of its remedies against the debtor.

■ In a related argument, the debtor also claims that the landlord's reacquisition of the premises pursuant to the Agreement constituted a valid surrender and acceptance of the premises under Minnesota law. "Surrender" is a term of art in the law of landlord-tenant relations which affords a tenant a release from liability under a lease when the landlord accepts return, or "surrender," of the leased premises. *Minneapolis Co-op v. Williamson*, 52 N.W. 986, 51 Minn. 53 (1892), *Sjoberg v. Hartz*, 271 N.W. 329, 199 Minn. 81 (1937).

■ Generally, the federal bankruptcy courts look to state law to define debtor and creditor interests. *Steyr–Daimler–Puch of America Corp. v. Pappas*, 852 F.2d 132 (4th Cir.1988). In circumstances where there is a conflict between state and federal law, however, federal bankruptcy law overrides state law, either expressly or implicitly, in resolving issues crucial to the reorganization of the debtor-creditor relationship. This is such a case.

To the extent section 365 is inconsistent with state law, the Supremacy Clause of the United States Constitution mandates that this Court follow federal law.[2] Article VI, clause 2, United States Constitution. *In re Spats Restaurant & Saloon*, 64 B.R. 442, 447 (Bankr.D.Nev.1986) (Doctrine of surrender preempted by section 365(d)(4)); *In re Southwest Aircraft Services, Inc.*, 53 B.R. 805 (Bankr.C.D.Cal.1985) (holding that rejection of a lease under section 365(d)(4)

**2.** This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound ·thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding. Article VI, Clause 2, United States Constitution.

cannot be modified or made to comply with California law).

If this Court were to apply the doctrine of surrender in the manner suggested by the debtor, landlords would be put in an untenable position by operation of section 365. Mclean's position would allow a debtor the power to escape from under the excessive burden of ill advised or unexpectedly oppressive unexpired leases by virtue of section 365 while forcing a landlord to leave vacant premises so rejected in order to avoid having the doctrine of surrender extinguish his remedies against the debtor. This is not only commercially unreasonable from the landlord's point-of-view, but would also operate to the detriment of the debtor by essentially keeping the landlord from using the property in a prudent manner which would mitigate damages for which the debtor may ultimately be liable.

Debtor's argument is also inconsistent with section 365(g)(1) which states that rejection of an executory contract or unexpired lease constitutes a breach of such contract or lease if such contract or lease has not been assumed by the debtor pursuant to the bankruptcy code. Applying the doctrine of surrender would have the effect of allowing state law to supersede section 365(g)(1), which treats the rejection as a breach and not a waiver of claims. Given this inconsistency between Minnesota surrender law and section 365, the Supremacy Clause prohibits this Court from allowing state law to modify or change the effect of rejection under section 365.

### III.(b) Interpretation of Section 365

█ The next issue before this Court is whether "rejection" of the lease under section 365 precludes the landlord from enforcing any remedy against the debtor for "termination" of the lease. The debtor contends that once this Court approved rejection of the lease, H.J. lost its rights to enforce any remedies it might have had against the debtor upon default of the rejected lease. This contention is based on the premise that "rejection" under section 365(a) is not "termination" of the lease

within the scope of section 502(b)(6), which allegedly limits actions against a debtor who has not completed its contract or lease obligations to those based on "termination."

Analysis of this argument must begin with a review of section 365(a). That section, in relevant part, provides that the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor. Further, as noted above, section 365(g) establishes that a rejection of an executory contract or unexpired lease is a breach of the contract or lease. Debtor cites a line of cases that support the proposition that rejection under section 365(g)(1) is not synonymous with the termination of the lease under section 502(b)(6). See, *In re Picnic 'N Chicken, Inc.,* 58 B.R. 523 (Bankr.S.D. Cal.1986), citing *Matter of Garfinkle,* 577 F.2d 901 (5th Cir.1978) (rejection of a lease under section 70(b) of the Bankruptcy Act of 1898, as Amended, did not constitute termination of the lease), *In re Storage Technology Corp,* 53 B.R. 471 (Bankr.D. Colo.1985). Therefore, debtor contends, the landlord is not entitled to damages for termination under section 502(b)(6) for a breach of contract.

Debtor's argument is based upon the erroneous assumption that if a claim is based on breach it is not a termination and the landlord is barred from collecting any damages from the debtor under section 502(b)(6). This is a gross misinterpretation of the Code. First, section 502(b)(6) does not create substantive legal rights on behalf of a landlord against a debtor in default, nor does it limit any rights of this type which do exist. The source of any such debtor-creditor rights is state law. Section 502(b)(6) merely limits the damages a landlord can collect from a debtor for "termination" of their lease. It does not operate to grant nor bar a claim. Its sole effect is to limit the amount for which a debtor may be liable for extinguishing its obligations under the lease by virtue of the Code.

A claim against the debtor based on breach or rejection of a lease is not auto-

matically disallowed if it falls beyond the scope of section 502(b)(6). The only consequence of finding section 502(b)(6) inapplicable to the transaction would be to allow the landlord to proceed unfettered against the debtor for damages of an amount unlimited by statutory limitations.

This Court believes the better view of the relationship between section 365 and section 502 is explained in *In re Moreggia & Sons, Inc.*, 852 F.2d 1179 (9th Cir.1988). At issue before the Ninth Circuit in that case was whether the bona fide lease requirement of section 502(b)(6) is properly applied to section 365(d)(3) and (4). The Court held that the bona fide lease requirements of section 502(b)(6) were applicable to section 365(d)(3) and (4) because those sections "read together, are part of a total scheme designed to set forth the rights and obligations of landlords and tenants in-. volved in bankruptcy proceedings." *In re Moreggia*, supra, 852 F.2d at 1182 (emphasis added). See also, *In re PCH Associates*, 804 F.2d 193 (2nd Cir.1986); *Bel–Ken Associates LTD. Partnership v. Clark*, 83 B.R. 357 (D.Mo.1988), *In re Hawaii Dimensions, Inc.*, 47 B.R. 425 (D.C.Hawaii 1985).

Thus, this Court holds that H.J.'s claims against the debtor for rejection of the lease, based on state law, constitute damages for termination within the scope of section 502(b)(6). This being the case, H.J.'s recovery for damages for rejection of the lease will be limited in the manner set forth by that provision.

### III.(c) Proof of Claim

■ Next, the debtor asks this Court to address whether H.J. has failed to adequately prove a claim for post-petition damages from rejection of the lease as required by 11 U.S.C. section 502(b)(6) and *City Bank Farmers Trust Company v. Irving Trust Company*. Debtor's argument here is that the landlord has failed to adequately prove damages from rejection in the manner required by *City Bank Farmers Trust Company v. Irving Trust Company*, 299 U.S. 433, 57 S.Ct. 292, 81 L.Ed. 324 (1937). Debtor cites that case and its progeny for the proposition that a landlord's claim must be calculated in the following manner:

> The amount of the landlord's claim for the loss of his lease necessarily is the difference between the rental value of the remainder of the term and the rent reserved, both discounted to present worth.

*Irving Trust, supra*, 299 U.S. at 443, 57 S.Ct. at 297. The thrust of the debtor's argument is based on the idea that all actual damages for injury resulting from rejection of an unexpired lease under the Code are calculated by discounting to present value. Careful review of *Irving Trust* makes clear that adopting the debtor's argument would be an incorrect application of law.

In *Irving Trust*, the Court noted in dicta that discounting to present value was the method of computing the landlord's damages which was adopted under section 77B of the Bankruptcy Act of 1898 (former Federal Bankruptcy Law) in *Kuhner v. Irving Trust Company, et al*, 85 F.2d 35 (2nd Cir.1936) (Learned Hand, Circuit Judge). *Kuhner*, however, stands for the proposition that the landlord's claim against the debtor's estate *for future rent after rejection of a lease* by the trustee is allowable and must be liquidated by discounting future payments and subtracting the appraised value of the term of the lease from their sum. *Kuhner, supra*, 85 F.2d at 37–38. The purpose for using this method is to avoid overcompensation in an award for future damages. *Moore v. Townsend*, 577 F.2d 424 (7th Cir.1978), citing *Petition of United States Steel Corporation*, 436 F.2d 1256, 1280 (7th Cir.1970); G. Dobbs, Remedies, section 8.7 (1973).

H.J.'s claims against the estate are not, however, based on damages for lost future rent payment which, if allowed, would properly be subject to the discounting process described in *Kuhner, Irving Trust* and their progeny. Since none of the damages claimed by H.J. are for future damages, this Court finds the debtor's *Irving Trust* argument inapplicable.

■ However, debtor's assertions that rejection of the lease only caused H.J. to be

deprived of $31,985.58 in rental income, and no decline in land value, have considerable merit. Under Minnesota law, a landlord still has a remedy for breach of the lease even after the tenant has abandoned the property and the landlord has accepted the abandonment. *Gruman v. Investors Diversified Services*, 247 Minn. 502, 78 N.W.2d 377, 381 (1956). Under section 502(a) and (b) of the Code, it is the duty of this Court, upon objection by a party in interest and a hearing as to any objection, to determine the value of such claims. Pursuant to that authority, this Court now addresses debtor's specific challenges to the two above referenced claims.

H.J. claims a loss of $94,588.30 in rental income for the period from September 14, 1987 until January 1, 1988. H.J. calculated this figure averaging its 1985 lease income of $304,302 with its 1986 lease income of $239,394 to arrive at a average annual income of $271,848. H.J. then divided this figure by 365 to arrive at a $744.79 average daily income which it allegedly lost during the 127 day period from Sept. 1, 1987 through Jan. 1, 1988. A review of H.J.'s proof of claim, however, reveals actual revenues during that period of $7,945.56 for banquet rooms and $110,519.55 for motel rooms. Under the terms of the lease, H.J. is entitled to 27% of the rental revenues, thus 27% of the total $118,465.11 revenue during that period. That being the case, this Court holds that H.J. is entitled to $31,985.58 in lost rental income for the September 14 through January 1 time period.

In addition, H.J. claims $400,000 from the debtor for damages and decline in the profitability of the property while operated by the debtor and by H.J. between September 14, 1987 and January 1, 1988. From the evidence before this Court, it is difficult to ascertain either how H.J. was damaged in that amount or, assuming the value of the rental property did decline after breach of the lease, why the debtor should be liable for any such decline.

Richard Cravens, a general partner of H.J. Burnsville, who operated the motel from September 14, 1987 until the property was sold on January 1, 1987, testified that the motel was fully operational on September 14. Mr. Cravens added that sales at the motel were in decline because the motel was located in an area with growing competition, was poorly managed, and needed rehabilitation.

The additional testimony of Robert Klein, an Executive Vice–President of Mclean Enterprises, supports the notion that any decline in value of the property was caused by an increasingly competitive market, and changes in the area surrounding the motel, and not poor management. Mr. Klein testified that he visited the motel frequently and had inspected the Burnsville property not more than 6 months prior to September 14, 1987. Mr. Klein inspected the property again on September 14, after H.J. assumed operation of the property. H.J. conducted a market study around this time to determine why the location was losing money. According to Mr. Klein's testimony, this study revealed that rent on the leasehold would have declined because additional motels had moved into the area which were causing a drain on business. The study also revealed that the occupancy rate was declining at a steady rate and the occupancy rate would have been zero by the end of the lease. The property was inspected twice a year. The results of these inspections revealed that H.J was not technically in violation of any of the Howard Johnson Company's operating standards, though some problems did exist which H.J. was given time to correct.

After assuming operation of the motel, H.J. sold it to the Royale Hospitality Group, Inc. for $2,620,000. Evidence indicates that the $2.6 million was a good price for this motel. Testimony reveals that it is customary in the motel industry to calculate the sale value of a motel by multiplying the average, annual room revenue (as determined by the average, daily occupancy and room rates) by three. The average, daily occupancy rate for 1986–87 of 38.2%, and the average, daily room rate for this time of $43.43, produce an average, annual room revenue of approximately $1,659.03 per day, or $605,544.49 per year. Using this calculus, the fair market value of the

property was $1,816,633.40.[3] Thus, there does not appear to be any decline in the rental value of the property for which the debtor should be held accountable. In fact, the sale price of $2,620,000 was $803,366.60 above the fair market value noted above. Therefore, debtor's objection to H.J.'s claim for $400,000 in lost value is hereby sustained.

### III.(d) Computation of damage cap

■ Finally, debtor asks this Court to consider whether H.J.'s claim is within the statutory limitation imposed by section 502(b)(6). Section 502(a) explains that a claim is to be allowed unless a party in interest objects. Section 502(b) adds that if such objection to a claim is made, the Court, after notice and a hearing, shall determine the amount of such claim. The amount so determined shall be allowed except, if such claim is the claim of a landlord for damages resulting from the termination of a lease of real property, the damages allowed to the landlord of the debtor are limited by section 502(b)(6).

Section 502(b)(6) was intended to compensate a landlord for his loss while not allowing a claim so large, based on a longterm lease, that other general creditors would be prevented from recovering a dividend from the estate.[4] H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 352–354 (1977); S.Rep. No. 95–989, 95th Cong.2d Sess. 62–65 (1978), U.S.Code Cong. & Admin.News 1978, p. 5787.

In order to possibly increase payment to other creditors in this manner, section 502(b)(6) imposes the following ceiling on the amount that a landlord can recover for present and future rent claims:

First, the Court must determine what actual damages would be awarded to the landlord under applicable state law for termination of the lease. Then, the landlord's recovery for these damages is limited to an amount no greater than

(1) the unpaid rent past due on the date of the petition, plus

(2) the greater of

(a) the rent due under the lease for the year following the petition; or

(b) 15 percent of the rent due pursuant to the terms of the lease for the remainder of the term. The amount calculated under the second prong of the test cannot exceed the rent due within three years following the petition.

Based on the foregoing analysis, H.J. is entitled to the following damages for rejection of the lease:

Lost Income = $31,985.58;

Filing Fees = $1,170.00;

Professional Fees = $24,837.89;

Purchase of Defaulted Leases = $20,220.00;

Franchise Fee = $20,000.00;

State Deed Tax = $3,415.50;

Closing/Disbursement Fee = $400.00;

Operating losses = $70,825.00

Late Mortgage Charges = $8,122.84

---

**3.** Even were this Court to adopt the creditor's method of calculating the sale value of the property, it appears the H.J. received a fair market price for the property. H.J. stated that to produce a value for the motel it would capitalize the average room revenues of $270,000 per annum by a factor of ten to arrive at a fair market value of $2.7 million. That figure is not only close to the actual sale price of $2.6 million, but appears inflated given the evidence of declining revenues due to extrinsic factors.

**4.** 502(b) provides in part that if objection to a claim is made, the Court, after notice and a hearing ...

shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall

allow such claim in such amount, except to the extent that ...

... (6) if such claim is the claim of a lessor for damages resulting from the termination of a lease of real property, such claim exceeds—
(A) the rent reserved by such lease, without acceleration, for the greater of one year, or 15 percent, not to exceed three years, of the remaining term of the lease, following the earlier of—
i) the date of the filing of the petition; and
ii) the date on which such lessor repossessed, or the lessee surrendered, the leased property; plus
(B) any unpaid rent due under such lease, without acceleration, on the earlier of such dates ...

11 U.S.C. section 502(b)(6).

This total of $180,975.81 is capped by the greater of 1) rent due for a year after the petition; or 2) 15 percent of the rent due under the lease, however the amount allowable as rent due for the remainder of the lease cannot exceed the total amount of three years rent remaining due under the lease. Due to the evidence of declining revenues, it is difficult to determine with certainty either the rent due within the year after the petition or the remainding rent due under the lease. It appears, however, that a good estimate of these figures would be based on the room revenues for 1986–87, therefore this Court adopts the figure of $176,303.79 as the best estimate of the rent which would be due per year after the petition.[5] The motel's rapidly declining rental income make it impossible to figure out what amount would constitue 15% of the total rental income due for the remainder of the lease. Therefore, the second prong of our section 502(b)(6) is based instead on a reasonable estimate of the rent due within three years following the petition. Adopting the $176,303.79 rental income figure from above, this Court finds three times that figure, or $528,911.37, to be a reasonable estimate of the income due for the three years after the petition. Since that $528,911.37 figure is greater than the amount of rent due for the year following the petition, this Court adopts $528,911.37, plus the amount of rents past due of $104,457.85, as a $633,369.22 cap on the damages for which the debtor can be held liable for rejection of the lease. H.J.'s claim for postpetition damages for rejection of the lease of $180,975.81 is considerably lower than $633,369.22, and therefore the damages allowed above are not reduced by virtue of section 502(b)(6).

### IV. Conclusion

H.J.'s is allowed an administrative claim under 11 U.S.C. section 503(b) in the amount of $11,952.31. H.J.'s is allowed a priority "gap" claim under 11 U.S.C. section 502(f) in the amount of $42,120.02.

Finally, based on the foregoing findings of fact and conclusions of law, H.J. is allowed a pre-petition, unsecured claim under 11 U.S.C. section 502 for unpaid rents past due of $104,457.85, and $180,975.81 for post-rejection damages.

The above and foregoing Memorandum Opinion constitutes Findings of Fact and Conclusions of Law as required under rule 7052, Rules of Bankruptcy.

SO ORDERED this 2 day of October, 1989.

---

**5.** The Burnsville Profit and Loss Statement— (Summary of August, 1987 indicates that room sales for 1986–1987 equaled $652,977.00. Thus, rent for 1986–87 would have been twenty-seven percent of that figure, or $176,303.79. That figure appears to this Court to be a good foundation upon which to base our estimate of the section 502(b)(6) damage cap.)