**In re ALLEGHENY INTERNATIONAL, INC., Sunbeam Corporation, Sunbeam Holdings, Inc., Almet/Lawnlite, Inc., and Chemetron Corporation, Debtors.**

**Bankruptcy No. 88–00448.
Adv. No. 91–23.**

United States Bankruptcy Court,
W.D. Pennsylvania.

Sept. 10, 1991.

Opinion on Motion for Reconsideration
Oct. 17, 1991.

John Edgar, McClure and Watkins, Pittsburgh, Pa., for Lincoln Liberty.

George L. Cass, Buchanan Ingersoll, P.C., Pittsburgh, Pa., for debtor.

Cynthia Baker, Fried, Frank, Harris, Schriver, & Jacobson, New York City, Joseph A. Katarincic, Katarincic & Salmon, Michael Lederman, Sunbeam–Oster Co., Inc., Pittsburgh, Pa., for Sunbeam–Oster.

Douglas A. Campbell, Campbell & Levine, Pittsburgh, Pa., for Sunbeam Unsecured creditors.

## MEMORANDUM OPINION

JOSEPH L. COSETTI, Bankruptcy Judge.

The matters presently before this Court are the Reorganized Debtor's objection to the claim of Lincoln Liberty and various motions for Summary Judgment filed by both Lincoln Liberty and the Reorganized Debtor.

Lincoln Liberty ("hereinafter "Lincoln") is the owner of an office building (the "Building") located at 625 Liberty Avenue, Pittsburgh, Pennsylvania. Lincoln, as lessor, and Allegheny International, Inc. (hereinafter "Debtor"), as tenants, entered into two separate agreements dated December 11, 1985 under which debtor agreed to lease space at Lincoln's building. The master lease covered three floors or 66,000 square feet of rentable area in the building. The occupancy lease covered 11 floors or 256,970 square feet of rentable space in the building. These agreements provided that the building was to be named the AI Tower.

The occupancy lease has a ten (10) year term. The occupancy lease was subsequently modified on December 19, 1985. On or about April 3, 1987, the occupancy lease was further modified by an Amendment of Lease and Termination of Lease Agreement (hereinafter "Amended Agreement") which terminated the Master Lease and allowed debtor to release from the

Occupancy Lease floors 6, 7 and 8 of the building, thereby reducing the debtor's aggregate rentable area to 187,132 square feet.

By letter dated October 29, 1987 Lincoln and the debtor agreed that construction on the building was sufficiently complete so that the commencement date under the terms of the amended lease was deemed to have occurred on September 30, 1987 (the lease commencement date). During the period from November 22, 1987 to February 20, 1988, the debtor made payments totaling $63,375.91 to Lincoln for estimated amounts of additional and supplemental rent due under the amended lease, and for parking rent for December 1987 to January 1988.

On February 20, 1988, the debtor filed a voluntary petition for relief under chapter 11, and shortly thereafter, on March 11, 1988, filed a motion to reject the amended lease pursuant to 11 U.S.C. § 365. On April 7, 1988, this court entered an order authorizing rejection of the amended lease. On May 6, 1988, Lincoln filed a proof of claim, No. 1625, which was amended on February 9, 1989. Lincoln's claim is in the amount of $9,454,481.32. Lincoln has no claim for unpaid pre-petition rent. The debtor has a credit for pre-petition rental overpayment in the amount of $28,594.38.

On March 21, 1989, the Official Committee of Unsecured Creditors of the debtor (the "Committee") filed an objection to Lincoln Liberty's Amended Claim. The reorganized debtor replaced the Committee in defending against Lincoln's claim, and after this court entered an order on December 5, 1990, directing the reorganized debtor to file an amended objection, Sunbeam–Oster (hereinafter "Reorganized Debtor") filed an Amended Objection to Lincoln Liberty's Amended Claim on January 15, 1991.

The Reorganized Debtor asserts that Lincoln has improperly interpreted the cap on damage claims by landlords set forth in 11 U.S.C. § 502(b)(6). The Reorganized Debtor further argues that the damages claimed by Lincoln in the amended claim are not properly calculated, are not proper under the terms of the amended lease, and are otherwise not allowable under section 502(b)(6). The Reorganized Company asserts that Lincoln's claim should be disallowed because alleged preferential payments have not been returned to the Debtor, and if allowed at all, only to the extent of $4,538,306.

Lincoln contends that the cap on damage claims by landlords set forth in 11 U.S.C. § 502(b)(6) entitles Lincoln to fifteen (15) percent of the rent reserved by the lease for the remaining term of the lease which amount does not exceed three (3) years of rent under the lease. Lincoln further contends that the Reorganized Company's complaint dealing with the alleged preferential payments is time barred pursuant to 11 U.S.C. § 546(a).

ANALYSIS

Initially, the Court must address the issue of the alleged preferential payments. The Reorganized Debtor maintains that all prepetition payments for rent due under the lease agreement are avoidable preferential transfers pursuant to 11 U.S.C. Section 547(b). The Reorganized Debtor also contends that because these alleged preferential transfers were not returned to the Debtor, Lincoln's entire claim should be disallowed. The preferential counterclaim is in the amount of $63,375.91, whereas Lincoln's claim is $9,454,481.32.

1. *The Two Year Statutory Limitation: Section 546(a)(1).*

█ Lincoln contends that the Reorganized Debtor's preference complaint was filed more than two (2) years after the commencement of the case and is barred by the statute of limitations found in Section 546(a) of the Bankruptcy Code. We find that the two (2) year statute of limitations does not apply to a Chapter 11 debtor-in-possession. *See In the Matter of Century Brass Products, Inc.,* 127 B.R. 720 (Bkrtcy. D.Conn.1991); *In re Mahoney, Trocki & Assocs.,* 111 B.R. 914, 918 (Bankr.S.D.Cal. 1990); *In re Korvettes, Inc.,* 67 B.R. 730 (S.D.N.Y.1986); and *In re Alithocrome Corp.,* 53 B.R. 906, 909 (S.D.N.Y.1985).

Lincoln argues that the case of *Zilkha Energy Co. v. Leighton,* 920 F.2d 1520

(10th Cir.1990), is controlling on this issue. We do not follow *Zilkha*. In *Zilkha* the court of appeals stated that "Congress intended for the word 'trustee' to apply to a debtor in possession", and therefore the word debtor in possession can be substituted in Section 546(a)(1). *Id.* at 1524. However, we must respectfully disagree with the Tenth Circuit Court of Appeals. Section 546(a)(1) of the Bankruptcy Code states:

(a) An action or proceeding under section 544, 545, 547, 548, or 553 of this title may not be commenced after the earlier of—
(1) two years after the appointment of a trustee under section 702, 1104, 1163, 1302 or 1202 of this title; ....

Even if this section is read in context with 11 U.S.C. Section 1107(a), the words "debtor in possession" cannot be substituted for the word "trustee" in this code section because a debtor in possession is not *appointed* under the specific code sections listed. The specific code sections listed in Section 546(a)(1) deal only with the appointment of a trustee.

There are many code sections which use the word "trustee" to which Section 1107 does not apply. 11 U.S.C. Section 546(a)(1) is one of the sections to which Section 1107 is not applicable.

## 2. *The Alleged Preferential Payments.*

■ Pursuant to 11 U.S.C. Section 547(b) the trustee, or as in this case, the debtor in possession may avoid certain preferential transfers of the debtor's property made before the filing of the bankruptcy. The DIP may avoid as preferential, transfers that occur under the following conditions: the transfer is (1) to or for the benefit of the creditor; (2) for or on account of an antecedent debt owed by the debtor before such transfer was made; (3) made while the debtor was insolvent; (4) made on or within 90 days before the date of the filing of the petition; and (5) that enables the creditor to receive more than it would receive in a chapter 7 distribution.

■ The burden of proving the statutory elements of a preference is on the debtor in possession. In the present case it is not necessary to address each requirement because the parties only dispute whether the payments were made on account of an antecedent debt.

■ The case law is clear that a debt is incurred when a debtor first becomes legally obligated to pay its creditor. *Barash v. Public Finance Corp.*, 658 F.2d 504, 511 (7th Cir.1981). In this case the Debtor was obligated to pay the additional and supplemental rent prior to the time the payments were made. This was a provision of the Amended Lease. The fact that the amounts of the payments were undetermined at the time of the contract does not negate a future obligation to pay.

■ The Reorganized Debtor has met the requirements of a preferential transfer, however, Lincoln Liberty argues that these payments fall under one of the exceptions to a preferential transfer. Section 547(c)(1) provides:

(c) The trustee may not avoid under this section a transfer—
(1) to the extent that the transfer was—
(A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and
(B) in fact a substantially contemporaneous exchange.

Lincoln Liberty has failed to establish that the payments made were a contemporaneous exchange for new value. 11 U.S.C. Section 547(a)(2) defines "new value" as:

money or money's worth in goods, services, or new credit, or release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor or the trustee under any applicable law, including proceeds of such property, but does not include an obligation substituted for an existing obligation.

Forbearance by a lessor from exercising its rights under the lease does not constitute new value as contemplated by section 547(a)(2) particularly where the debtor is not using the premises. *E.g., Charisma Investment Co. v. Airport Systems, Inc.*

*(In re Jet Florida System, Inc.)*, 841 F.2d 1082, 1083–84 (11th Cir.1988).

█ The reorganized debtor is also correct in its contention that ordinary course of business exception of 11 U.S.C. Section 547(c)(2) is not applicable to the present action. These payments were the very first payments made in accordance with the contract. The parties agreed, in November 1987 that rent payments would be due retroactively to September 30, 1987. This was a unique arrangement and cannot be characterized as being in the ordinary course of business. Payments made pursuant to special and unique agreements are outside of the ordinary course of business. *In re Jet Florida System, Inc.*, 73 B.R. 552 (S.D.Fla.1987), *aff'd*, 861 F.2d 1555 (11th Cir.1988).

█ The payments made to Lincoln Liberty constitute preferential transfers. The reorganized debtor contends that in accordance with 11 U.S.C. Section 502(d), Lincoln Liberty's entire claim is disallowed because it has not returned the preferential transfer. This interpretation would read 502(d) as being a forfeiture and that contention has no merit. The payments were not determined to be preferential until the date of this Memorandum Opinion. Lincoln Liberty has stated that it is ready, willing and able to return the payments if it is determined by the Court that the payments are indeed preferential. The preferential payment of $63,375.91 will be set off from the amount of rent owed to Lincoln Liberty.

### 3. *The Rent Claim.*

In summary, this court concludes that the "or 15 percent" found in 11 U.S.C. § 502(b)(6) should be computed as 15% of the time of the remaining term of the lease which acts as a cap on Lincoln's claim for damages; that the petition date, February 20, 1988, is the date from which the damages under the lease are measured under 11 U.S.C. § 502(b)(6); that the obligations to pay for parking are included as rent reserved under the occupancy lease within the meaning of 11 U.S.C. § 502(b)(6); that the parking facilities were suitable for parking passenger cars prior to December

1, 1987, so that the obligation to pay amounts for parking arose prior to that time; that an inflation factor does not apply to the computation of parking rent or additional rent unless the amount is expressly provided for in the lease; that the "without acceleration" language in 11 U.S.C. § 502(b)(6) does not require reduction of the calculated amount to be reduced to net present value; and that interest on the amount equal to the reorganized company's cost of funds on the undisputed portion of its claim from December 12, 1990 is required to be paid.

### A. Section 506(b)(6)(A)

█ In order to calculate the appropriate amount of damages to Lincoln, the court must determine the proper computation of the cap on allowable damages pursuant to 11 U.S.C. § 502(b)(6). Bankruptcy Code section 502(b)(6) limits the amount that a landlord can claim for unpaid rent resulting from the rejection of a lease of real property. Section 502(b)(6) does not provide a formula for ascertaining the total nonbankruptcy damages. However, after the landlord computes such a claim under applicable non-bankruptcy law, that claim is compared with, and limited by, the statutory maximum provided in section 502(b)(6).

The parties have stipulated that Lincoln's non-bankruptcy claim for the remaining term of the occupancy lease is $38,724,641. The parties agree that this amount exceeds the statutory limit.

The effect of section 502(b)(6) is to limit the claim which a debtor may be liable. *In re McLean Enterprises, Inc.*, 105 B.R. 928, 933 (Bankr.E.D.Mo.1989). Section 502(b)(6)(A) provides in relevant part:

(6) if such claim is the claim of a lessor for damages resulting from the termination of a lease of real property, such claim exceeds—

(A) the rent reserved by such lease, without acceleration, for the greater of one year, or 15 percent, not to exceed three years of the remaining term of such lease, following the earlier of—

(i) the date of the filing of the petition; and

(ii) the date on which such lessor repossessed, or the lessee surrendered, the leased property....

11 U.S.C. § 502(b)(6)(A)(i) and (ii).

The parties are in dispute over the appropriate interpretation of section 502(b)(6)(A) and that section's application to the computation of the "or 15 percent" on a claim for damages. The reorganized debtor asserts that the statute specifically refers to a period of time by stating that damages are limited to the rent for the next 15% of the remaining term of the lease. Lincoln contends that the "or 15 percent" relates to the rent reserved under the lease for the remaining term of the lease. The court is called to determine whether the "or 15 percent" should be interpreted in relation to the total amount of rent reserved or the total amount of time remaining in the term of the lease.

The legislative purpose of section 502(b)(6) was to limit the landlord's claim to a reasonable amount that will not prevent other unsecured creditors from recovering a dividend from the estate. *In re Monetary Group, et al.,* 91 B.R. 138, 142 (Bankr.M.D.Fla.1988). The legislative history of section 502(b)(6) clearly indicates that the limitation applies not to the total rent reserved, but to the remaining term:

> The damages a landlord may assert from termination of a lease are limited to the rent reserved for the greater of one year or ten percent[1] of the remaining lease term ... after ... the date of surrender.

H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 353 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6309.

The wording of section 502(b)(6)(A) measures the amount of the allowable claim by the amount of time remaining under the lease. *In re Danrik, Ltd.,* 92 B.R. 964 (Bankr.N.D.Ill.1988). The entire statute speaks in terms of time periods for which rent is due after termination of a lease. A claim cannot exceed the greater of one year, or 15 percent, not to exceed three years of the remaining term ... following the earlier of the date of the filing of the petition and the date surrendered.

Furthermore, the statute clearly refers to the next succeeding period when the statute provides that the rent reserved must be computed "without acceleration." The "without acceleration" clause is intended to prevent an acceleration clause in the lease agreement from requiring all remaining rent to be due immediately upon breach. If 15 percent is applied to the total rent for the remaining term of the lease, the "without acceleration" clause would reduce the effect. In essence, if 15% of the total reserved rent was computed as the cap, then it would be necessary to calculate the expectant rent increases provided from the escalation clause of the lease agreement.

Section 502(b)(6)(A) is derived from previous law which expressly stated that the limitation on damages was to be calculated based on "the rent reserved ... for the 3 years next succeeding." The new "sliding scale" formula in section 502(b)(6)(A) was intended merely as a replacement of the dual provisions of previous law. No other changes in previous law were intended. H.R. No. 95–595, 95th Cong., 1st Sess. 353 (1977); *In re Watkins Management Group, Inc.,* 120 B.R. 586, 587 (Bankr. S.D.Ala.1990).

Predecessor statutes of section 502(b)(6) expressly provided that damages were to be capped based on the succeeding years rent. In cases under the predecessor statute of section 502(b)(6) which, like the present case, involved leases that had escalation clauses after a period of time, the courts calculated the cap based on the rent due in the succeeding year. *In re Bonwit, Lennon & Co.,* 36 F.Supp. 97, 99 (D.Md. 1940).

Even in those cases where the rent reserved remained constant over the life of the lease and where courts seem to apply the 15 percent cap to the remaining rent reserved, the courts recognize that the statute applies to the term immediately following termination of the lease and that the statutory cap limited the amount of time for which a landlord could receive

---

1. The bill was later amended to increase the cap to 15%.

rent. No other changes in the previous law were intended. *In re Watkins Management Group, Inc.*, 120 B.R. at 587. If the rent were constant the calculations would be similar.

A landlord, unlike other creditors, regains its original assets upon bankruptcy and can relet them to another tenant. *Kuehner v. Irving Trust Co.*, 299 U.S. 445, 455, 57 S.Ct. 298, 303, 81 L.Ed. 340 (1937). From an economic viewpoint, the statutory cap was an attempt by Congress to reflect this fact. By allowing the landlord a period of time in which to relet the premises, the landlord has the opportunity to restore itself to the same position as if the lease had not been terminated.

Lincoln relies on cases in which the rent reserved remains constant over the life of the lease in support of its argument that the 15% cap applies to the total rent reserved. The computation of damages is the same whether the 15% is calculated as a percentage of the remaining term of the lease, or as a percentage of the total rent remaining on the lease. However, it is inappropriate to compare such cases to the present case. Furthermore, these cases also recognized that the statute applies to the term immediately following termination. *See, In re McLean Enters., Inc.*, 105 B.R. at 936, [The amount calculated under the second prong of the test (the 15 percent figure) cannot exceed the rent due within three years following the petition]; *In re Watkins Management Group, Inc.*, 120 B.R. at 587, [The lessor's claim must equal the greater of (1) one year's rent reserved under the lease, or (2) 15 percent of the remaining term of the lease]; *In re Danrik*, 92 B.R. at 971, [The wording of section 502(b)(6) measures the amount of the allowable claim by the amount of time remaining under the lease]; *In re The Monetary Group*, 91 B.R. at 142 n. 4, [The "statute ... refers to an amount equal to 'the rent reserved by the lease, without acceleration' for a maximum specified term"]; *In re Goldblatt Bros., Inc.*, 66 B.R. 337, 339 (Bankr.Ill.1986), [The court calculated the damage cap by measuring the rent for the first three years from the

date the debtor abandoned the leased premises].

Therefore, upon review of the plain language in light of the legislative history of the statute and related case law, the court finds that the "or 15 percent" cap applies to the next succeeding term remaining in the lease.

**B. The Date of Surrender**

 Section 502(b)(6) provides that the cap on the claim of a lessor for damages resulting from the termination of lease of real property should be measured:

[F]ollowing the earlier of:

(i) the date of the filing of the petition; and

(ii) the date on which such lessor repossessed, or the lessee surrendered, the leased property.

11 U.S.C. § 502(b)(6)(A)(i), (ii).

The reorganized debtor asserts that the debtor/lessee surrendered the property to Lincoln/lessor prior to the filing of the petition. Lincoln contends that the property was never surrendered. This court finds that there was no absolute and/or unequivocal act of surrender. The court therefore concludes that surrender did not occur prior to the filing of the bankruptcy.

To determine the month from which damages should be measured, the court must decide whether surrender did in fact occur. This issue is important because the lease had a special provision which gave the debtor 6.5 months of free rent. With regard to the question of what constitutes surrender under section 502(b)(6) of the Code, this appears to be a case of first impression. "Surrender" is a term not defined by the Bankruptcy Code. Furthermore, Pennsylvania law provides no cases which examine the term "surrender" under bankruptcy law. "Surrender," as a term of art in landlord tenant law, may have limited application in the interpretation of the Bankruptcy Code. *In re Spats Restaurant & Saloon*, 64 B.R. 442, 447 (Bankr. D.Nev.1986). However, the manner in which Pennsylvania courts have interpreted "surrender" can serve as a guide to this court's consideration of an appropriate defi-

nition of the term as it is applied under the Bankruptcy Code.

As a minimum, the definition of surrender implies that rights of the tenant in the leased property must be impaired in order to effect a surrender and that the landlord's rights must commence.

 Pennsylvania law has defined surrender as the giving up of an estate to the person who has it in reversion or remainder or the giving up of a lease before its expiration. Under Pennsylvania law, the surrender of a lease, as contract, is governed by the intention of the parties. The issue in Pennsylvania cases is whether or not there was evidence of an intention on the part of the lessors to accept the lessee's surrender of the lease. This becomes a question of fact. The burden of proving the lessor's acceptance of surrender of the lease by an express agreement or unequivocal act of the parties is upon the lessee. Under Pennsylvania law, the continuation of the rights of the tenant in the lease property must be impaired to constitute surrender. *Lawton v. Deangelo,* 169 Pa.Super. 380, 82 A.2d 900 (1951).

 The Uniform Commercial Code also provides some guidance to the court in defining the term "surrender." The notice requirements of UCC Section 2–610, which addresses anticipatory repudiations, can be related to the type of notice necessary to the surrender of a lease prior to the expiration of the lease agreement. "In order to constitute an anticipatory breach of contract, there must be a definitive and unequivocal manifestation of intention on the part of the repudiator that he will not render the promised performance when the time fixed for it in the contract arrives." *Bill's Coal Company, Inc. v. Board of Pub. Util., Etc.,* 685 F.2d 360, 361 (10th Cir.1982). A surrender of the lease is not a breach of the lease agreement and requires acceptance by the lessor, and in that regard is dissimilar from an anticipatory repudiation. This court holds that surrender must be evidenced by something more than a general manifestation of intention, an unequivocal or definitive act must occur. A surrender could have been evidenced by a writing declaring the debtor's/lessees' intention to surrender at a specific date.

The facts of this case show that the debtor's rights in the leased property were not legally impaired prior to filing bankruptcy. The occupancy lease required all notices to be in writing. The actual intent of the debtor was to prevent the breach of this lease from being used as a cause by the twenty-six large Banks which the debtor had agreements with, to determine that an act of default had occurred regarding other larger loan agreements. This effort by the debtor prevented an actual surrender. Further, the debtor held itself out as having a valid lease in its representations to bondholders of the debtor.

This court finds that the lease was not surrendered, prior to the filing and that the cap on Lincoln's claim for damages resulting from the termination of the lease is to be measured by the date of the filing of the bankruptcy petition pursuant to section 502(b)(6)(A).

## C. The Calculation of Damages

In light of the court's conclusion that the section 502(b)(6) cap on damages is interpreted as meaning 15% of the next succeeding time remaining in the lease and the court's decision that the damages must be measured from the date of the petition, the court now must determine the proper amount of damages.

To determine the appropriate amount of damages, the court must look at the amounts claimed under the separate components of the lease. Lincoln's claim for rent from the debtor is comprised of four components: "base rent", "additional rent", "supplemental rent" and "parking rent". The occupancy lease called for a free base rent period beginning on the commencement date of the lease and continuing for 194 days. The first day which "base rent" would have been due was April 12, 1988. The parties agreed that the contract commenced on September 30, 1987. Therefore, 51 days of free base rent must be accounted for when applying the section

502(b)(6) cap to the components of Lincoln's claim.[2]

The parties dispute whether the parking lease is an integral part of the occupancy lease. The court finds that the parking lease is an integral part of the occupancy lease and allows that part of the claim for parking rent.

Beginning September 30, 1987, Lincoln submitted invoices to the debtor including parking charges at the rate of $150 per space per month. Lincoln has asserted in its amended claim that the aggregate parking rent reserved for the remaining lease term is $542,065 or $187.73 per month per space. Lincoln arrived at that amount by applying a 5% inflation factor. The parking lease provides only that the rent shall be the prevailing market rate. The lease does not contain an explicit inflation factor. Lincoln has not introduced convincing evidence to substantiate its claim for increased parking rates. Therefore, the parking rent should be allowed at the $150 rate that the debtor was originally charged.

The reorganized debtor contends that Lincoln's claim for a 1987 parking delinquency in the amount of $7,625 is improper. However, the evidence was that at least one executive of the debtor made regular use of the parking facilities. Therefore, this component of the parking rent claim is allowed.

The reorganized debtor asserts that the cap contained in section 502(b)(6) should be discounted to present value. Claims for damages based on lost future rent payment should be discounted to present value. *In re McLean Entrs., Inc.,* 105 B.R. 928, 934 (Bankr.W.D.Mo.1989), [citing *Kuehner v. Irving Trust Co.,* 85 F.2d 35 (2d Cir.1936), aff'd, 299 U.S. 445, 57 S.Ct. 298, 81 L.Ed. 340 (1937) and *City Bank Farmers Trust Co. v. Irving Trust Co.,* 299 U.S. 433, 57 S.Ct. 292, 81 L.Ed. 324 (1937) ]. The discount applies to the total claim and not to the cap of section 502(b)(6). Even if Lincoln's non-bankruptcy damage claim was reduced to present value using discount factors between 8% and 12%, the amount still exceeds the cap in section 502(b)(6).

It is a fundamental proposition of law that damage awards for obligations due in the future are discounted to present value to avoid overcompensation of an award for future damages. *Chesapeake & Ohio Ry. Co. v. Kelly,* 241 U.S. 485, 36 S.Ct. 630, 60 L.Ed. 1117 (1916); *Moore v. Townshend,* 577 F.2d 424 (7th Cir.1978). The application of the cap provided in section 502(b)(6) makes a reduction to present value unnecessary.

The amount of the claim, allowable under section 502(b)(6) is $7,535,026.73. This amount was derived from the following calculations:

**2.** 1988 was a leap year and therefore February contained 29 days.

Important Dates Which Apply to the Calculations

Contract Commencement Date: September 30, 1987
Surrender Date: February 20, 1988
Completion Date: September 30, 1997
Base Rent Payment Begins: April 12, 1988
Free Rent Period: Sept. 30, 1987 to Apr. 11, 1988
Free Rent Period After Surrender: Feb. 20, 1988 to Apr. 11, 1988 (1.75 Months)

## BASE RENT:

The base rent is comprised of 2 components:
1. $26.50 per year per square foot (187,132), which equals $4,958,998. per year (or $413,249.83 per month) plus
2. $528,750 per year (or 44,062.50 per month) beginning on expiration of the free rent period.

Monthly Base Rent Equals: $457,312.33

## APPLICATION OF 506(b)(6) TO BASE RENT:

| One Year: | 457,312.33 | Monthly Base Rent |
| | × 10.25 | Months (Free Rent 1.75 Mos.) |
| | $ 4,790,763.85 | |

| Three Years: | 457,312.33 | Monthly Base Rent |
| | × 34.25 | Months (Free Rent 1.75 Mos.) |
| | $15,662,947.30 | |

| 15% of Remaining Lease Term: | 115.25 | Months Remaining in Lease |
| | × 15% | |
| | 17.29 | 15% of Remaining Lease |
| | − 1.75 | Months of Free Rent |
| | 15.54 | |
| | × 457,312.33 | Monthly Base Rent |
| | $ 7,106,633.61 | |

---

Section 506(b)(6) states that the lessor is entitled to the greater of one year, or 15 percent of the remaining term of such lease as long as the 15 percent does not exceed three years of rent. In the present case, 15 percent of the remaining term is greater than one year and less than three years, therefore Lincoln is entitled to a claim for base rent in the amount of $7,106,633.61.

## SUPPLEMENTAL RENT:

This was a further component of the rent and was designed to pay a portion of the operating expenses of the building. The free rent period did not apply to supplemental rent and it was determined by:

| 70,500 | square feet |
| × .50 | |
| $35,250.00 | per year (or $2,937.50 per month) |

APPLICATION OF 506(b)(6) TO SUPPLEMENTAL RENT:

| One Year: | 2,937.50 | Monthly Supplemental Rent |
|---|---|---|
| | × 12 | Months |
| | $ 35,250.00 | |

| Three Years: | 2,937.50 | Monthly Supplemental Rent |
|---|---|---|
| | × 36 | Months |
| | $ 105,750.00 | |

| 15% of Remaining Lease Term: | 115.25 | Months Remaining in Lease |
|---|---|---|
| | × 15% | |
| | 17.29 | 15% of Remaining Lease |
| | × 2,937.50 | Monthly Supplemental Rent |
| | $ 50,798.38 | |

---

Again, 15 percent of the remaining term is greater than one year and less than three years, therefore Lincoln is entitled to a claim for supplemental rent in the amount of $50,798.38.

ADDITIONAL RENT:

The Debtor was required to pay additional rent in monthly estimated installments which would be adjusted after an end of the calendar year audit. Lincoln maintains that $7.66 reflects the adjustment for the actual space maintenance obligation for 1988. Lincoln also argues that it is entitled to the estimated amounts plus a 5% inflation factor for the remaining years of the lease. Lincoln has submitted no proof to support this claim. It is not allowed.

The additional rent was to be paid by the following calculation:

| $ 7.66 | Actual Space Maintenance |
|---|---|
| −6.50 | Base Expense Rate |
| $ 1.16 | |
| ×187,132 | Rentable Square Feet |
| $217,073.12 | per year (or $18,089.43 per month) |

APPLICATION OF 506(b)(6) TO ADDITIONAL RENT:

| One Year: | 18,089.43 | Monthly Additional Rent |
|---|---|---|
| | × 12 | Months |
| | $217,073.16 | |

| Three Years: | 18,089.43 | Monthly Additional Rent |
|---|---|---|
| | × 36 | Months |
| | $ 651,219.48 | |

| 15% of Remaining Lease Term: | 115.25 | Months Remaining in Lease |
|---|---|---|
| | × 15% | |
| | 17.29 | 15% of Remaining Lease |
| | × 18,089.43 | Monthly Additional Rent |
| | $ 312,766.24 | |

Lincoln is entitled to a claim of $312,766.24 for additional rent.

PARKING RENT:

The lease granted the debtor 25 parking spaces and required $150.00 per month, per space. Lincoln has again added a 5% inflation factor which is not allowed. The monthly parking rate would have been $3,750.00.

APPLICATION OF 506(b)(6) TO PARKING RENT:

One Year:
3,750.00 Monthly Parking Rent
× 12 Months
$ 45,000.00

Three Years:
3,750.00 Monthly Parking Rent
× 36 Months
$ 135,000.00

15% of
Remaining
Lease Term:
115.25 Months Remaining in Lease
× 15%
17.29 15% of Remaining Lease
× 3,750.00 Monthly Parking Rent
$ 64,837.50

Lincoln is entitled to a claim of $64,837.50 for parking rent.

The total amount of the allowed claim is $7,535,026.73 minus $63,375.91 for the preferential payment, or $7,471,650.82. The Reorganized Debtor is to pay this claim in accordance with the plan of reorganization within ten (10) days of this Memorandum Opinion and Order of Court. In addition, Lincoln is entitled to Pennsylvania's legal rate of interest, 6%, on the amount of the claim to be paid from the date that all creditors in the same class were paid.

An appropriate order is attached.

## MEMORANDUM OPINION ON MOTION FOR RECONSIDERATION

■ The matter presently before this Court is Lincoln Liberty's Motion for Reconsideration of this Court's September 10, 1991 Memorandum Opinion and Order of Court. See page 396. The motion for reconsideration is granted.

Both parties agree that the Actual Space Maintenance rate for 1988 was $7.46. Therefore, the Court's calculation should be as follows:

$ 7.46 Actual Space Maintenance
− 6.50 Base Expense Rate
$ .96
× 187,132 Rentable Square Feet
$179,646.72 per year (or $14,979.56 per month)

APPLICATION OF 506(b)(6) TO ADDITIONAL RENT:

| 15% of Remaining Lease Term: | 115.25 | Months Remaining in Lease |
|---|---|---|
| | × 15% | |
| | 17.29 | 15% of Remaining Lease |
| | × 14,970.56 | Monthly Additional Rent |
| | $ 258,840.98 | |

---

Lincoln's argument that the actual 1989 rates should be used in determining the claim for additional rent were addressed by the previous opinion. The rates which are to be used are the actual rates in effect at the petition date.

Sunbeam–Oster has noted an additional mechanical error in this Court's calculation of the total amount of the claim. The Debtor had a pre-petition credit for rent in the amount of $28,594.38 which was not included in the calculation of the total claim. 11 U.S.C. Section 502(b)(6)(B) allows the landlord to receive all unpaid rent. The preference was subtracted incorrectly from the total claim. The proper calculation should be as follows:

| | |
|---|---|
| Base Rent | $ 7,106,633.61 |
| Supplemental | 50,798.38 |
| Additional | 258,840.98 |
| Parking | 64,837.50 |
| | $ 7,481,110.47 |
| | |
| plus 502(b)(6)(B) | 34,781.53 |
| | $ 7,515,892.00 |
| | |
| × Distribution to Class 5.AI.1 | 60.54% |
| | $ 4,550,121.02 |
| | |
| minus Preference | − 63,375.91 |
| TOTAL AMOUNT DUE AS OF DECEMBER 12, 1990 | $ 4,486,745.11 |

---

Lincoln Liberty has also requested that this Court clarify the September 10, 1991 Order as it relates to interest. At page 401 of the Memorandum Opinion, the Court stated "that interest on the amount equal to the reorganized company's cost of funds on the *undisputed portion of its claim* from December 12, 1990 is required to be paid." The Court also intended that Lincoln Liberty receive six (6) percent interest on the remainder of its claim.

Upon consummation of the plan of reorganization, Lincoln Liberty requested that

**410**

Sunbeam–Oster pay the "undisputed portion" of its claim, which Lincoln Liberty believed was $6,424,609.74. Sunbeam–Oster did not respond to this request and Lincoln Liberty filed an emergency motion to compel the payment of this undisputed portion.

Lincoln Liberty's original claim was for $9,454,481.32. The Official Committee of Unsecured Creditors filed an objection to a portion of the claim on March 21, 1989, stating that the claim should be allowed only in the amount of $6,424,609.74. On November 7, 1990, after the emergency hearing, this Court ordered that Lincoln Liberty's election period be extended until the Court ruled on the entire matter.

On December 7, 1990, this Court ordered Sunbeam–Oster to file an amended objection to the claim of Lincoln Liberty. On January 15, 1991, Sunbeam–Oster filed its amended objection which objected to the entire amount of the claim. In accordance with the plan of reorganization, the claim which this Court found to be an allowed claim can not be paid until the Order becomes final.

There is an obvious danger to creditors in a confirmed plan of reorganization in that it permits delay in the payment of claims until appeals to the objection is final. This delay of a later successful claim harms a creditor unless interest is required to be paid.

■ All other creditors similarly situated were paid on December 12, 1990. Interest is easily called for in this case to discourage such a delay. Equity requires the Court to reconsider the rate of interest. The Court awards interest at the rate equal to the reorganized company's cost of funds for the entire claim.

Sunbeam–Oster may, in accordance with section 1.15 of the plan of reorganization, withhold payment until the appeal is final.

An appropriate order is attached.

### ORDER OF COURT

AND NOW, this 17 day of October, 1991, IT IS HEREBY ORDERED, ADJUDGED AND DECREED that Lincoln Liberty's Motion for Reconsideration is GRANTED.

IT IS FURTHER ORDERED that the total amount of Lincoln Liberty's allowed claim is $7,515,892.00. The distribution to Lincoln is $4,486,745.11 plus interest at the rate equal to the reorganized company's cost of funds for the entire claim from December 12, 1990.